716 A.2d 395

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
RICHARD FEASTER, DEFENDANT–APPELLANT.

Argued October 21, 1997—Decided July 30, 1998.

4

6

*Abby P. Schwartz* and *Ruth Bove Carlucci,* Assistant Deputy Public Defenders, argued the cause for appellant (*Ivelisse Torres,* Public Defender, attorney).

*Debra A. Owens,* Deputy Attorney General, argued the cause for respondent (*Peter Verniero,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

STEIN, J.

Defendant, Richard Feaster, was tried and convicted of the following offenses in connection with the death of Keith Donaghy: purposeful-or-knowing murder by his own conduct, *N.J.S.A.* 2C:11–3a(1) and/or (2); felony murder, *N.J.S.A.* 2C:11–3a(3); conspiracy to commit murder, *N.J.S.A.* 2C:5–2; first-degree robbery, *N.J.S.A.* 2C:15–1; conspiracy to commit armed robbery, *N.J.S.A.* 2C:5–2; possession of a weapon for an unlawful purpose, *N.J.S.A.* 2C:39–4a; and possession of a sawed-off shotgun, *N.J.S.A.* 2C:39–3b.

In accordance with the penalty-phase verdict rendered after a separate proceeding following the murder conviction, *see N.J.S.A.* 2C:11–3c(1), defendant was sentenced to death. On the noncapital counts, defendant's conspiracy convictions merged into the related substantive offenses, and the felony murder conviction was merged into the conviction for purposeful-or-knowing murder. The court also merged the conviction for possession of a weapon for an unlawful purpose into the robbery/murder convictions. The court then imposed a consecutive twenty-year term with ten years of parole ineligibility on the robbery conviction as well as a five-year concurrent term on the conviction for possession of a sawed-off shotgun.

Defendant appeals as of right to this Court. *N.J.S.A.* 2C:11–3e; *R.* 2:2–1(a)(3). We affirm defendant's convictions and sentence of death.

# I

## Facts

Jury selection for defendant's trial began in Gloucester County on December 5, 1995. Because *voir dire* revealed that many potential jurors in the area had knowledge of a second murder for which defendant was separately charged, the attendant risk of prejudice led the court to discontinue Gloucester County jury selection on January 3, 1996. On January 12, 1996, the court ordered that a foreign jury from Salem County be impaneled to hear the case. The guilt phase of defendant's trial took place from February 28 through March 15, 1996. The court conducted the penalty phase on March 21, 22, 25, 26 and 27, 1996.

### A. The State's Case

The following summary of the trial proofs fairly represents the evidence that supported the jury's guilt-phase verdict.

### 1. *Events Before the Murder*

The events culminating in the October 6, 1993, death of Keith Donaghy originated within a circle of young friends from Gloucester County. The principle members of this group included defendant, Michael Mills, Michael Sadlowski, James Graves and Daniel Kaighn. Defendant was a native of Woodbury Heights while the others were from National Park, another Gloucester County municipality.

Several weeks before the killing, defendant approached Kaighn and asked to borrow a handgun. Defendant explained that he needed a weapon to collect money that his boss owed to him. Defendant alleged that his boss was a "crazy ex-Vietnam vet," and that the gun was necessary for his protection. After repeated

requests spanning several weeks, and upon defendant's promise to pay $100 for one day's use of the gun, Kaighn acquiesced. He supplied defendant with a sawed-off twenty-gauge shotgun, a single lead ball, commonly referred to as a "slug," and three or four "birdshot." Kaighn had previously sawed the barrel from the gun and retained the barrel in his bedroom. Defendant picked up the gun from Kaighn's house two weeks prior to the murder and placed it in a blue gym bag. He told Kaighn to meet him at Michael Mills's house later that night.

That evening, Kaighn arrived at Mills's house at approximately 8:30 p.m. Shortly thereafter, defendant arrived and returned the gun to Kaighn along with all the ammunition he had been given earlier in the day. He presented Kaighn with $30, explaining that his boss failed to pay him the full amount owed to him. Others were present at Mills's house that night, and a party soon began, during which Kaighn left and hid the gun and ammunition underneath an old bathtub outside the house. Kaighn testified that the cocaine he ingested at the party had left him "paranoid," and that he did not want to leave with the gun on his person because of his fear of apprehension by law enforcement authorities. According to Kaighn, that was the last time he saw the gun until after the murder, although he acknowledged that he subsequently may have told Mills where the gun was hidden.

Tina Shiplee lived with Michael Sadlowski in an apartment in Runnemede. Shiplee and defendant's girlfriend, Kelly Zuzulock, frequently socialized with the other members of the group. Shiplee testified that in late September or early October 1993, defendant approached her and asked if he could keep a gym bag in her car, explaining that his parents had recently "kicked him out" of their house. Shiplee obliged, and allowed defendant to store the bag in the back of her station wagon. She was unsure whether defendant or Mills placed the bag in the car.

Subsequently, but still prior to the murder, Shiplee went to place her daughter's stroller in the back of the car. As she attempted to move the bag, she realized how heavy it was.

Shiplee felt the outside of the bag and suspected that it contained a gun.

### 2. *The Night of the Murder*

On October 6, 1993, Shiplee drove her station wagon to pick up Kelly Zuzulock and proceed to the Columbia Cafe, a bar in National Park in Gloucester County. Zuzulock and defendant had dated on and off since high school, and had resumed their relationship after defendant returned from a brief residence in Florida. During the weeks leading up to the murder, Zuzulock testified that their relationship had become precarious, characterized by frequent arguments. She attributed the deterioration of the relationship to their increasing drug use.

Shiplee picked up Zuzulock and the two arrived at the Columbia Cafe sometime between 6:30 and 7:30 p.m. Defendant, Mills, Sadlowski, and others were already there. According to Sadlowski, he drove Shiplee's other car, a 1986 Chevrolet Camaro, and brought both defendant and Michael Mills to the Columbia Cafe. The group had gathered for a pool tournament being held at the bar. Shiplee approached defendant, and without revealing her concern that the gym bag contained a gun, requested that he remove the bag from her car. Defendant agreed to remove the bag before leaving that night, although Shiplee was unsure whether it was Mills or defendant who eventually took the bag from the car. Shiplee had left the car unlocked in the parking lot. On leaving the Columbia Cafe later that night, she observed that the bag had been removed from her car.

Shortly after arriving, Mills inquired of Sadlowski whether he could take the Camaro and drive defendant to retrieve money from defendant's boss. Sadlowski declined the request. Defendant then asked Shiplee if Sadlowski could borrow her car to drive defendant to collect money from his boss. Having been instructed previously that night by Sadlowski that she should not lend her car to defendant, Shiplee refused. Defendant then asked Shiplee if she would drive him, or whether she would allow him to take the

car himself. Shiplee rejected each request. Defendant also asked Zuzulock if he could borrow her car, but she also refused and explained that she did not have access to it.

Renee Burkhardt, a resident of National Park, had also driven to the Columbia Cafe on the evening of October 6. Burkhardt described defendant as a "friend of a friend," and knew Mills because he was dating her friend Jennifer Stryzek. After speaking with defendant, Mills approached Burkhardt and asked to borrow her car. Burkhardt agreed and handed the keys to Mills.

Burkhardt testified that after she gave Mills the keys to her mother's 1984 Oldsmobile, she observed Mills and defendant leave the Columbia Cafe and enter the car, with Mills in the driver's seat. Zuzulock also testified that she saw defendant leaving the bar at around 8:00 p.m., and that Mills followed a few minutes later. Shiplee similarly testified that a few minutes after she saw defendant leave the bar, Mills left with Renee Burkhardt. She stated that defendant and Mills left between 8:00 and 8:15 p.m. However, Sadlowski testified that they left between 8:30 and 9:00 p.m. Shiplee then observed Burkhardt return to the bar shortly thereafter.

On the night of October 6, 1993, Keith Donaghy was the only attendant working at the Family Texaco in Deptford Township. Dana Smolenski, a frequent patron of the gas station, pulled into the Texaco to purchase gasoline between 8:20 and 8:25 p.m. When no attendant came to serve her, she pulled her car nearer to the office window and peered inside. She observed that the chair on which Donaghy usually sat had been knocked over, and saw his body on the floor. Frightened, Smolenski quickly drove away, noticing that it was 8:25 p.m. John Fortner, another frequent customer, arrived at the Family Texaco around 8:30 p.m. After pumping the kerosene he used for his heaters, Fortner approached the office to pay and saw Donaghy lying on the floor inside. He walked to the nearby 7–Eleven and requested that someone call the police. At about the same time, another couple made a similar request at the 7–Eleven after noticing Donaghy's

body. The Family Texaco is approximately a twelve-minute drive from the Columbia Cafe.

Roughly thirty to forty-five minutes after leaving the bar, defendant called Zuzulock at the Columbia Cafe from a pay phone. Zuzulock did not recall what the conversation was about. Shortly thereafter, Mills returned to the bar. Defendant also returned, five to ten minutes after Mills. According to Zuzulock, defendant appeared to have been using drugs, as she noticed white powder around his nose. Sadlowski noticed that defendant and Zuzulock began to argue when he returned to the bar.

Defendant, Zuzulock, Shiplee and Sadlowski had agreed that they would all return to Shiplee's and Sadlowski's apartment after leaving the bar. The group began to leave the Columbia Cafe at around 10:00 p.m. As Shiplee was finishing her last game of pool before leaving, circling the table contemplating her next shot, she overheard defendant say to Mills and Sadlowski that he could not "believe he killed the guy and didn't get any money." At trial, Sadlowski denied that defendant had made such a statement to him.

Leaving the Columbia Cafe, Sadlowski drove defendant to Shiplee's apartment. At the apartment, defendant insisted on watching the eleven o'clock news. When the coverage describing the murder of Keith Donaghy aired, defendant requested the volume be raised and told Sadlowski to "check this one part out." After the segment was over, Sadlowski observed that defendant had become sweaty and "fidgety," and that he stated, "I can't believe I did this shit. I can't believe this. Why me? You know." On the apartment balcony, after the news broadcast, defendant again told Sadlowski, "I can't believe I did this shit." Sadlowski did not press defendant for additional details.

Shiplee left the bar separately with Zuzulock, and the two also planned to return to Shiplee's and Sadlowski's apartment. They drove by the apartment twice but did not see the car Sadlowski was driving. Zuzulock then decided to go home. After dropping her off, Shiplee returned to her apartment, where she immediately

became embroiled in an argument with Sadlowski. When defendant injected himself into the fight, Shiplee said to him, "Fuck you, Rich. You just went out and killed somebody." Shiplee testified at trial that the comment produced "a blank look on his face, like there was no feeling, whatsoever, to the expression on his face, so it was just like what did you just say to me." However, in a prior statement to prosecutors, Shiplee stated that defendant had denied the accusation. Sadlowski also testified that he did not hear Shiplee make the allegation.

Sadlowski thereafter left the apartment to drive defendant home. On the way to the car, defendant engaged in a shouting match with patrons of a bar across the street from the apartment. As defendant and Sadlowski entered the car, defendant volunteered that he "blew the dude's head off." Defendant also lamented to Sadlowski that he "screwed up tonight." At that point Sadlowski thought defendant was referring to the quarrel he had with Zuzulock at the bar. Defendant added, "I can't believe I did this." During the ride home, defendant tearfully explained that "his brains went all over the place" and repeated that "I can't believe I did this shit." Sadlowski dropped defendant off and, vowing not to become involved in any way, avoided defendant after October 6.

### 3. *Events After the Murder*

The autopsy revealed that Donaghy died from a single shotgun wound to the head. No defensive wounds existed to suggest that a struggle had occurred. The injury suffered was a "contact" wound, meaning that the barrel of the gun had been placed directly against the skin when fired. Shot into the side of the mouth, the bullet followed a slightly downward trajectory, blowing out Donaghy's teeth and effectively destroying his brain before exiting through the back of his head. At trial, despite defendant's objection, the court allowed the State to employ a mannequin with a needle through its head to demonstrate the trajectory of the

bullet. The blood-stained overalls worn by Donaghy on the night of the murder were admitted into evidence.

The murderer stole $191.32 from one of Donaghy's pockets. Because only one of Donaghy's pockets was in plain view as he lay dead on the ground, and because money remained in Donaghy's other pockets that were not exposed, the State theorized that defendant did not take the money until after he killed Donaghy. That supported the State's argument that, before he arrived at the Family Texaco, defendant intended to kill as well as to rob the gas station attendant.

The initial investigation into Donaghy's murder proceeded without much success. On October 31, 1993, Ronald Pine, an attendant at an Amoco station in Deptford, was stabbed to death. On November 1, Amoco offered $5000 for information leading to the apprehension and conviction of Pine's killer; on November 4, the New Jersey Gas Retailers Association followed with a $5,000 reward for information leading to the arrest and conviction of the murderer of any New Jersey gas station owner or attendant.

Shortly after Pine's murder, Zuzulock mentioned to Shiplee that she noticed a cut on defendant's hand. Suspecting that defendant committed the second murder and suffered the injury in the course of the stabbing, and fearing that he might kill again, Shiplee contacted a lawyer. On November 3, Shiplee's lawyer, Joseph Hoffman, contacted Richard O'Brien of the Franklin Township Police Department. O'Brien then called Shiplee and she gave a statement implicating defendant in both crimes.

Defendant eventually was charged with both murders. The indictments ultimately were severed and no witnesses were permitted to mention the second murder during the trial. The trial court initially ruled that, if impeached by her motive to obtain reward money, Shiplee could testify that her knowledge of the second murder and fear of defendant's future actions prompted her to contact the authorities. The defense therefore did not attempt to question her about the reward during the State's case. The Appellate Division, on interlocutory appeal, reversed the

ruling and permitted the impeachment of Shiplee without allowing the prejudicial rehabilitation testimony. A compromise was reached, permitting defense counsel to use the reward offer to show not that it prompted Shiplee to come forward, but that it prompted her to tailor her testimony at trial; in return, she would be able to testify that her fear that defendant might kill again—without mentioning the second murder—led her to come forward. The defense then recalled Shiplee and questioned her about the reward.

After Shiplee gave her initial statement to police, an officer contacted Michael Mills and arranged an interview. Mills met with police on November 4, 1993, but his statement was not admitted at trial because of his suicide on June 18, 1994. Before his death, however, Mills did lead authorities to recover the murder weapon. At approximately 1:15 a.m. on November 4, 1993, while driving with investigators from the Gloucester County Prosecutor's Office to his home, Mills and the officers stopped at the White Bridge. Spanning Woodbury Creek, the White Bridge leads into National Park and is located between the Columbia Cafe and the Family Texaco station. The bridge is approximately seven-tenths of a mile from the Columbia Cafe. As a result of their conversation with Mills, police searched for the murder weapon in Woodbury Creek. The following day members of the Camden County Underwater Rescue Team assisted in the search. They recovered a shotgun at the bottom of the creek, later confirmed to be the murder weapon.

Shortly after midnight on November 4, 1993, police simultaneously executed a search warrant and arrest warrant at defendant's home in Woodbury Heights. Defendant was given *Miranda* warnings at his home before police formally read defendant those warnings at the prosecutor's office. Defendant subsequently signed a waiver form and agreed to submit to police questioning. Investigator Angelo Alvarado of the Gloucester County Prosecutor's Office and a detective from the Deptford Township Police Department began interrogating defendant. The investiga-

tors asked defendant about his present employment. Defendant responded that he worked in construction and that his employer was James McCall. Alvarado confronted defendant with the incriminating information that they had received. Defendant then expressed a desire to speak with counsel, and the interview ended. At trial, Alvarado was permitted to testify that defendant's invocation of his right to counsel was the reason that the interview terminated.

The Gloucester County grand jury subsequently indicted defendant, charging him with purposeful-or-knowing murder by his own conduct, in violation of *N.J.S.A.* 2C:11–3a(1) and/or (2); felony murder, in violation of *N.J.S.A.* 2C:11–3a(3); first-degree robbery, in violation of *N.J.S.A.* 2C:15–1; possession of a weapon for an unlawful purpose, in violation of *N.J.S.A.* 2C:39–4a; and possession of a sawed-off shotgun, in violation of *N.J.S.A.* 2C:39–3b. Although not indicted on the conspiracy charges, the trial court charged those crimes as lesser-included offenses. See *N.J.S.A.* 2C:1–8(d)(2).

At trial, the State presented the testimony of Kevin Wrigley, a/k/a Kevin Bock. Wrigley alleged that he briefly shared the same holding cell with defendant and another individual while defendant was awaiting trial. After Wrigley conceded that the cell had been dark and that he did not recognize defendant in court, defense counsel immediately challenged the admission of Wrigley's testimony. The court conducted a *Rule* 104 hearing and determined that sufficient indicia of reliability supported admission of the testimony. Wrigley subsequently identified defendant in court, his previous view of the defense table having been partially obstructed. The court observed that the position of the witness stand was such that it hampered a complete view of the courtroom.

While in the cell Wrigley heard defendant, who had identified himself as Rich Feaster, describe how he shot someone in the head at point-blank range in order to "see what it felt like" to kill someone before he entered the Marines. Wrigley also heard

defendant admit that he took "a couple hundred dollars" from the scene of the crime. Regarding the murder weapon, Wrigley testified that "[defendant] said he threw it in a lake or something like that, threw it away, got rid of it." Wrigley also maintained that the individual in the cell had a "Rich" tattoo on his arm. As the third occupant of the holding cell left to return to the general prison population, Wrigley heard defendant request that the man tell Mike "Shalusky or something like that" that defendant was in the prison. Additionally, Wrigley testified that defendant described "a guy named Mike" who was also involved in the crime: "[Defendant] says [Mike] was a witness and his dad had him taken care of. He thought he committed suicide or something like that." Wrigley's testimony was not the only occasion on which the jury heard of Mills's suicide; that fact also had been mentioned in the State's guilt-phase opening, during the redirect examination of Daniel Kaighn, and during defense counsel's summation.

The State also presented the testimony of James McCall, the person whom defendant at his interrogation had identified as his employer. McCall testified that defendant worked for him on one day only, which was after the murder, and that he had been paid for that day. McCall further testified that he did not owe defendant any money.

No physical evidence directly linked defendant to Donaghy's murder.

B. Defendant's Case

Defendant did not testify at trial. The primary defense strategy was characterized by a sustained attack on the credibility of key State witnesses. On cross-examination of Daniel Kaighn, defense counsel explored his significant drug use, lengthy criminal record and prior inconsistent statements, as well as the favorable treatment Kaighn received in exchange for his cooperation with the State. Kaighn also admitted having feigned a suicide attempt in order to secure a transfer out of the facility in which he had been incarcerated.

Similarly, the defense highlighted Sadlowski's use of drugs and alcohol, and elicited on cross-examination his admission that he was "hammered" on the night of the murder. He testified that he did not hear defendant's incriminating statement allegedly made near the pool table at the Columbia Cafe; Sadlowski also did not recall Shiplee's accusation made against defendant back at the apartment. The defense also stressed the consideration Sadlowski received from the State for his testimony, and the discrepancies in the three separate statements he had given to authorities.

Shiplee admitted having consumed three or four beers while at the Columbia Cafe, and conceded that she may have smoked marijuana earlier that evening. Shiplee also admitted that the comment she overheard defendant make at the bar could have been a "drunk intoxicated statement." Although she previously testified that a "blank look" came over defendant's face when she accused him of the murder and that defendant uttered no response, on cross-examination Shiplee admitted providing authorities with an earlier contradictory statement. In that statement, Shiplee said defendant denied her accusation. After the Appellate Division decided the interlocutory appeal regarding Shiplee's proposed testimony about her motive for coming forward, the defense recalled her to the stand during its case-in-chief. Rather than focusing on the reward as the motive for her contacting the authorities, the defense stressed her present motive to collect the $5000 reward. As the reward could be obtained only after defendant's conviction, defense counsel suggested that the money motivated Shiplee to tailor her present testimony against defendant to secure that conviction.

The defense also attacked the credibility of Kevin Wrigley and the accuracy of his testimony. Defense counsel explored Wrigley's criminal history, including his pending charge for aggravated assault stemming from an incident in which he hit an individual over the head with a lead pipe. Regarding defendant's alleged comments about the murder, Wrigley conceded that most jail talk is unreliable "most of the time." The defense also attempted to

show that Wrigley could not have shared the same holding cell with defendant, and therefore did not overhear any incriminating statements made by defendant. Shirleen Firman, the deputy warden of the Gloucester County jail, testified that jail records indicated that Wrigley had been removed from the holding cell on November 3, 1995. On cross-examination, the State highlighted the absence of jail records pertaining to defendant. Also elicited on cross-examination were Firman's admissions that the holding cell area was often very busy and that the jail records were not always accurate. The State and the defense stipulated that between January 1995 and December 1995, the only time defendant was housed overnight at the Gloucester County jail was from the afternoon of November 8 through November 9, 1995.

The defense supplemented its impeachment of State witnesses by producing an alleged admission of Herrill Washington that he had committed the crime. According to Barrick Wesley, he and Washington had "cased" the Family Texaco during the summer of 1993 in preparation for a possible return to rob the establishment. While in the Salem County jail, Wesley spoke with Washington by telephone on October 5, 1993. Washington allegedly told Wesley that he planned to rob the Texaco station. A few days later, Wesley spoke again to Washington. Wesley testified that during the conversation Washington said he committed the robbery and shot the attendant in the face.

Washington testified at trial and denied the facts about which Wesley had testified. The State theorized that because an unknown informant had incriminated Washington regarding an unrelated burglary, Washington may have made the false incriminating statements to Wesley in an effort to determine whether Wesley was the individual who had been informing on him.

During closing arguments, defense counsel stressed the lack of direct evidence in the case, and attacked the credibility of the State's witnesses. Defense counsel also mentioned Mills's suicide, openly suggesting that Mills and not defendant was the triggerman:

> The [S]tate made a better case against Michael Mills than they have against [defendant]. It couldn't be more clear. Who borrowed the car? Michael Mills. Who stopped on the [W]hite [B]ridge? Although we are not privy to the conversations that occurred, the shotgun is pulled from the water. Who? Michael Mills. Who moved the bag out of Shiplee's car? Michael Mills.

The defense also questioned the feasibility of defendant's committing the crime based on the time frame described by some witnesses, and also noted that for some time the murder weapon had been unaccounted for.

The prosecutor focused on the acts indicating premeditation and intent on the part of defendant. Despite scant support in the record, he called Mills the "getaway driver" and described in detail the events that occurred at the Family Texaco and that culminated in Donaghy's murder.

## C. The Verdict

During the charge, the court instructed the jury to first deliberate on own-conduct murder before reaching the issue of accomplice liability. Additionally, the court repeatedly reminded the jury that unanimity was required on each charge to constitute a verdict, but that unanimity was not required with regard to the specific form of murder and the question whether defendant committed the murder by his own conduct.

On March 15, 1996, the jury returned a guilty verdict on all counts charged in the indictment. The jury also found defendant guilty of conspiracy to commit murder and conspiracy to commit armed robbery. The jury also found that defendant had killed Donaghy by his own conduct. Thus, the jury's verdict triggered a penalty phase to determine whether a sentence of death would be imposed.

## D. The Penalty Phase

The sole aggravating factor alleged by the State was that the murder occurred while defendant was engaged in the commission of a robbery. See N.J.S.A. 2C:11–3c(4)(g). Originally, the State also alleged as an aggravating factor that defendant was a prior

murderer, *N.J.S.A.* 2C:11–3c(2)(e), on the basis that he also had been indicted for the murder of Ronald Pine. Because the State contemplated trying the two cases jointly, the State's intention, in the event of a double conviction, was to use each murder to support a death sentence for the other murder. The trial court disallowed that strategy. Furthermore, the question became moot when the two indictments were severed, and defendant pled guilty to the Pine murder after being sentenced to death for the Donaghy murder. For the second murder, defendant received life imprisonment with a thirty-year parole disqualifier, along with a consecutive sentence of twenty years for first-degree armed robbery with ten years of parole ineligibility. Those sentences were to run consecutively to those imposed for the Donaghy murder.

During its penalty-phase opening and summation, the State stressed that defendant should be made to "accept responsibility" for his actions. The State did not call witnesses during the penalty phase. Rather, it incorporated by reference the evidence presented during the guilt phase, and then rested its case.

Defendant relied on ten mitigating factors:

1. Defendant never had been convicted of a crime and had never been incarcerated previously.

2. Defendant was twenty-two and not fully matured at the time of the crime.

3. Defendant suffered one or more head traumas resulting in an organic brain condition that affected his judgment and impulse control to the [extent] that normal people are not affected.

4. Defendant's ability to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was impaired as a result of mental disease and/or defects and emotional disturbances and intoxication.

5. Defendant was raised in a household with one alcoholic parent, which predisposed him to substance abuse and delinquent behavior, undermining the controls normally present in others.

6. Defendant was raised in a home with an emotionally and physically abusive father, substantially affecting his maturation and development, with the effect, among others, of predisposing him to delinquent and violent behavior to the extent normal adults are not so predisposed.

7. Defendant had an excellent work record while living in Florida, away from the turmoil of his family, which was interrupted only by a work-related injury.

8. Defendant was a successful athlete during adolescence and high school, responding well to coaching and discipline.

9. Defendant's success under coaching and sports and in working in an environment away from the turmoil of his family demonstrated that he could be rehabilitated in a regimented environment such as prison.

10. Any other factor that the jurors, or any one of them, may deem relevant to defendant's character or record or to the circumstances of the offense.

Defendant presented the testimony of several experts. Dr. Steven Portman, a neurologist, described abnormally excessive electrical activity in the left frontal lobe of defendant's brain. He testified that people with that condition tend to be impulsive and have memory problems. Dr. Jonathan Willard–Mack, a clinical neuropsychologist, also testified that injuries to the left frontal lobe affect one's ability to control impulses. He diagnosed defendant as suffering from encephalopathy, or brain injury, as a likely result of a series of concussions. The alleged head injuries sustained by defendant were caused by a fall from a pickup truck, an incident in which defendant was injured when his head hit a tree, and repetitive impacts incurred during his football career. Dr. Frank Dyer, a psychologist, described defendant as possessing borderline intelligence. He testified that the alcoholic and abusive household in which defendant was raised was a traumatic environment, but expressed the view that therapy could help defendant. Dr. Robert Latimer, a psychiatrist, also testified that defendant's ability to control impulses was compromised by encephalopathy, but that he could be helped through psychotherapy and counseling.

Defendant's mother testified that defendant's father was an alcoholic who verbally abused her and defendant. As defendant grew older, physical altercations between him and his father were common. Amy Feldman, a social worker, described the Feaster home as one "in denial," in which Mrs. Feaster and defendant were abused.

Two jurors accepted the third mitigating factor, that defendant suffered a judgment-impairing organic brain disorder resulting from head traumas. Five jurors accepted the factor that defendant's father was physically and emotionally abusive, and three jurors found the ninth factor, that based on defendant's work

record in Florida and his high school athletic experience he was amenable to rehabilitation in prison. The jury unanimously rejected the remaining mitigating factors. The jury also concluded unanimously that the sole aggravating factor outweighed beyond a reasonable doubt any mitigating factor or factors, thus resulting in defendant's death sentence. In his subsequent motion for a new trial, defendant advanced numerous bases for the requested relief, all of which were denied by the court.

## II

### Sequential Presentation of Own–Conduct Murder and Accomplice–Liability Murder and Allegedly Inconsistent Instructions on Own–Conduct Nonunanimity Option

We address this claim first because it implicates the central issue raised on defendant's appeal.

Perceiving that a rational basis existed to support a jury finding that defendant, despite participating in the crime, did not commit the murder "by his own conduct," *N.J.S.A.* 2C:11–3c, the court provided an accomplice-liability charge to the jury. The presentation of the own-conduct murder charge and the accomplice-liability charge, and the relationship between the two, is of critical importance because own-conduct murder is punishable by death but accomplice-liability murder is not. *N.J.S.A.* 2C:11–3c; *see also State v. Gerald,* 113 *N.J.* 40, 100, 549 *A.*2d 792 (1988)(noting, with sole exception of murder for hire, "a defendant whose conviction is based on a theory of vicarious liability cannot be subjected to death-penalty proceedings").

Defendant argues that the court's sequential presentation of own-conduct murder and accomplice-liability murder, and its admonition to the jury that it reach the accomplice liability question only after first acquitting on own-conduct murder, effectively relegated the non-death-eligible option to second-class status. In other words, defendant contends that the rigid sequencing of the charge and deliberations improperly coerced the jury into reaching a death-eligible verdict.

Additionally, defendant focuses on the court's repeated instruction that the jury be unanimous with regard to all issues, while at the same time informing the jury that it need not be unanimous on the "own-conduct" question. Defendant contends that those contradictory instructions left the jury "hopelessly confused," leading the jurors to believe that they had to be unanimous on the own-conduct determination in order to return a valid murder conviction.

### A. Sequential Presentation of Own–Conduct Murder and Accomplice–Liability Murder

The court first charged the jury on the elements of purposeful-or-knowing murder, during which it did not mention the question whether defendant committed the murder by his own conduct. After charging on the lesser-included offenses of aggravated manslaughter and reckless manslaughter, the court instructed on accomplice liability, tailoring its charge to fit the facts of the case:

> In this case the State contends that the defendant . . . committed the offenses for which he is charged, the murder, the felony murder, the robbery, I'm talking about those in particular right now, against Keith Donaghy by his own conduct.

> If you are convinced of that beyond a reasonable doubt, then you need not consider the alternative type of culp[a]bility or responsibility, that is, where a defendant may be found guilty of an offense because of the conduct of another person for whom he is legally accountable.

> This is accomplice liability. If you find that the actual crimes were committed by the conduct of another person, who I will refer to throughout this portion of my instructions simply as X, [it] could be any other person, then you will consider whether the defendant shall be found guilty because he is legally accountable as an accomplice of X. You've heard about Michael Mills and it could be anyone.

> If you are not convinced beyond a reasonable doubt that the defendant acted by his own conduct in committing these crimes, then you may consider and should consider whether he should be found guilty of them because of being legally accountable as an accomplice of some other person, and you'll only consider these instructions on accomplice liability if you first determine that he is not directly responsible by his own conduct.

The court repeated this description of the sequential relationship between own-conduct murder and accomplice liability on at least three other occasions during its instructions.

■ There is nothing inherently wrong with sequential charges, which "usually provide a framework for orderly deliberations." *State v. Cooper*, 151 *N.J.* 326, 369, 700 *A.*2d 306 (1997)(quoting *State v. Coyle*, 119 *N.J.* 194, 223, 574 *A.*2d 951 (1990)); *State v. Zola*, 112 *N.J.* 384, 405, 548 *A.*2d 1022 (1988), *cert. denied*, 489 *U.S.* 1022, 109 *S.Ct.* 1146, 103 *L. Ed.*2d 205 (1989). Indeed, for courts to instruct juries not to consider lesser-included offenses unless they first acquit on the greater charge is a common practice. *Cooper, supra*, 151 *N.J.* at 366, 700 *A.*2d 306; *Coyle, supra*, 119 *N.J.* at 223, 574 *A.*2d 951; *State v. McAllister*, 211 *N.J.Super.* 355, 365, 511 *A.*2d 1216 (App.Div.1986); *see also State v. Harris*, 141 *N.J.* 525, 552–53, 662 *A.*2d 333 (1995)(explaining that rationale supporting sequential charge is to have jury convict of offense supported by evidence as opposed to reaching compromise verdict); *State v. Perry*, 124 *N.J.* 128, 164–65, 590 *A.*2d 624 (1991)(approving sequential charge for non-felony-murder offenses); *People v. Boettcher*, 69 *N.Y.*2d 174, 513 *N.Y.S.*2d 83, 505 *N.E.*2d 594, 597 (1987)(approving sequential charge for lesser-included offense, noting that contrary rule would "give insufficient weight to the principle that it is the duty of the jury not to reach compromise verdicts ... but to render a just verdict by applying the facts it finds to the law it is charged").

However, the propriety of a sequential charge becomes suspect in certain capital cases when a jury is presented with an alternative non-death-eligible form of murder rather than a traditional lesser-included offense. In such instances, we have repeatedly expressed our concern about the coercive effect a sequential charge may have on a capital jury. Prompting that concern is our belief that a sequential charge may cause a jury "that believes a defendant guilty of something to convict on the first and most serious charge" without giving due consideration to the non-death-eligible offense. *State v. Mejia*, 141 *N.J.* 475, 484, 662 *A.*2d 308 (1995); *see also State v. Purnell*, 126 *N.J.* 518, 530, 601 *A.*2d 175 (1992) (vacating death sentence where jury was not permitted to consider "all of the possible offenses"); Cannel, *New Jersey Criminal Code, Annotated,* comment 14 on *N.J.S.A.* 2C:1–

8(e)(1997) ("[I]n a capital case, where there is support in the evidence for a non-capital murder conviction, the jury must be given every opportunity to convict of the charge not carrying the death penalty."); *cf. United States v. Tsanas,* 572 *F.*2d 340, 345 (2d Cir.)(noting that "[w]here one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of *some* offense, the jury is likely to resolve its doubts in favor of conviction.")(quoting *Keeble v. United States,* 412 *U.S.* 205, 212–13, 93 *S.Ct.* 1993, 1997, 36 *L. Ed.*2d 844, 850 (1973)), *cert. denied,* 435 *U.S.* 995, 98 *S.Ct.* 1647, 56 *L. Ed.*2d 84 (1978).

In *Mejia, supra,* we considered a defendant's challenge to a sequential charge and verdict sheet that effectively required the jury to first acquit on purposeful-or-knowing murder before reaching the question whether defendant purposefully or knowingly caused serious bodily injury resulting in death. 141 *N.J.* at 482, 662 *A.*2d 308. At the time of the defendant's crimes in *Mejia,* "serious-bodily-injury" murder was not punishable by death. *Gerald, supra,* 113 *N.J.* at 89, 549 *A.*2d 792. Constitutional and statutory amendments have since made serious-bodily-injury murderers eligible for the death penalty. *N.J. Const.* art. I, para. 12; *L.* 1993, *c.* 111 (signed May 5, 1993); *Mejia, supra,* 141 *N.J.* at 482, 662 *A.*2d 308.

We found that the sequential charge in *Mejia* constituted one of the "crucial defects" in the court's instructions that required reversal of the defendant's death sentence. *Id.* at 483–84, 662 *A.*2d 308. Noting that serious-bodily-injury murder is an alternative form of homicide rather than a lesser-included offense of "intent to kill" murder, *id.* at 484, 662 *A.*2d 308, we observed that the court's treatment of serious-bodily-injury murder as a lesser-included offense "reduced the likelihood that the jury would consider whether defendant intended to cause only serious bodily injury." *Id.* at 485, 662 *A.*2d 308.

In *Coyle, supra,* 119 *N.J.* at 209–12, 574 *A.*2d 951, we reversed a death sentence primarily because of the trial court's failure to provide the charge on serious-bodily-injury murder formerly re-

quired by *Gerald, supra,* 113 *N.J.* at 92, 549 *A.*2d 792. Nevertheless, we also found harmful error in the court's sequential charge on purposeful murder and passion/provocation manslaughter, *Coyle, supra,* 119 *N.J.* at 222–23, 574 *A.*2d 951, observing that the sequential charge "had the potential to foreclose jury consideration of whether passion/provocation should reduce an otherwise purposeful killing from murder to manslaughter." *Id.* at 222, 574 *A.*2d 951.

In our most recent decision regarding sequential charges in capital cases, we relied on the unique nature of felony murder in upholding a trial court's sequential presentation of capital murder and felony murder. *Cooper, supra,* 151 *N.J.* at 369–70, 700 *A.*2d 306. We acknowledged that felony murder is not a traditional lesser-included offense because its elements may differ from those of capital murder. *Id.* at 365, 700 *A.*2d 306; *Purnell, supra,* 126 *N.J.* at 531, 601 *A.*2d 175. Nevertheless, we noted *Purnell*'s admonition that in a capital case in which the State relies on the commission of a felony (robbery) as an aggravating factor, that reliance affirms the existence of "a rational basis for the jury to choose the death-ineligible option of finding defendant guilty of felony murder," *id.* at 532, 601 *A.*2d 175, and that accordingly felony murder should be treated as a lesser-included offense in determining what crimes to submit to the jury. *Id.* at 530–31, 601 *A.*2d 175; *Cooper, supra,* 151 *N.J.* at 365, 700 *A.*2d 306. Analytically, therefore, we regarded felony murder as a lesser-included offense in assessing the propriety of a sequential charge in that context. *Cooper, supra,* 151 *N.J.* at 366, 700 *A.*2d 306.

In upholding the court's sequential presentation of capital murder and felony murder, *Cooper* distinguished felony murder from the passion/provocation manslaughter offense implicated in *Coyle*. When evidence of passion/provocation manslaughter is produced, in order to obtain a conviction for murder the State must prove beyond a reasonable doubt that the purposeful killing was not the product of passion based on reasonable provocation. *State v. Powell,* 84 *N.J.* 305, 314–16, 419 *A.*2d 406 (1980). In that

sense, the mental states for a purposeful killing and passion/provocation manslaughter "were interrelated." *Cooper, supra,* 151 *N.J.* at 369, 700 *A.*2d 306. Conversely, felony murder is a strict-liability crime. *Id.* at 369–70, 700 *A.*2d 306. Thus, because "there is no connection between the required mental state for purposeful-or-knowing murder and that for felony murder," *id.* at 369, 700 *A.*2d 306, we sustained a sequential charge of capital murder and felony murder. *Id.* at 370, 700 *A.*2d 306.

The threshold issue is whether accomplice-liability murder is an alternative theory of murder that should be considered simultaneously with death-eligible purposeful-or-knowing murder.

■ When the Legislature enacted the New Jersey Death Penalty Act (Act), *L.* 1982, *c.* 111, it "resurrect[ed] the distinction between a principal and an accomplice" in determining whether a defendant is a candidate for the death penalty. *State v. Brown,* 138 *N.J.* 481, 509, 651 *A.*2d 19 (1994) (quoting *Gerald, supra,* 113 *N.J.* at 93, 549 *A.*2d 792). Pursuant to *N.J.S.A.* 2C:11–3c, a person found guilty of murder is eligible for the death penalty only if he murdered by his own conduct, procured the murder by payment or promise of payment of anything of pecuniary value, or commanded or by threat or promise solicited the murder as the leader of a narcotics trafficking network. However, the own-conduct requirement is unrelated to the State's burden of proof to obtain a conviction of purposeful-or-knowing murder:

> The requirement that the homicidal act be committed by the defendant's own conduct is simply irrelevant to the question of whether defendant is guilty of purposeful or knowing murder. During guilt-phase proceedings, the jury first must determine whether defendant should be convicted of murder, considering, where appropriate, principles of vicarious liability under *N.J.S.A.* 2C:2–6. Only after it has unanimously found defendant guilty of purposeful or knowing murder should the jury turn to the question of whether defendant committed the homicidal act by his or her own conduct.
>
> [*Gerald, supra,* 113 *N.J.* at 100, 549 *A.*2d 792.]

■ Thus, the own-conduct requirement is not an element of purposeful-or-knowing murder; it acts solely as a "trigger" with regard to whether a death-penalty phase of a trial will occur. *Brown, supra,* 138 *N.J.* at 510, 651 *A.*2d 19; *State v. Moore,* 207

*N.J.Super.* 561, 576, 504 *A.*2d 804 (Law Div.1985); *see also Gerald, supra,* 113 *N.J.* at 93, 549 *A.*2d 792 ("The legislative history of the Act makes it clear ... that in enacting *N.J.S.A.* 2C:11–3(c), the Legislature intended to distinguish, *for purposes of punishment only,* a murderer who actually killed—the 'triggerman'—from one whose conviction rests on a theory of vicarious liability ....")(emphasis added); *see also N.J.S.A.* 2C:2–6a ("A person is guilty of an offense if it is committed by his own conduct or by the conduct of another person for which he is legally accountable, or both.").

 Therefore, because both principal and accomplice are equally guilty of purposeful-or-knowing murder under New Jersey's statutory scheme, accomplice-liability murder is an alternative and not lesser-included form of murder. See *Mejia, supra,* 141 *N.J.* at 484, 662 *A.*2d 308 (noting that because one who intends not to cause death but serious bodily injury that results in death is still a murderer, "serious-bodily-injury murder is an alternative form of homicide, not a lesser-included offense of 'intent to kill' murder"); *cf. Cooper, supra,* 151 *N.J.* at 369, 700 *A.*2d 306 (distinguishing felony murder, because no connection links the required mental states for purposeful-or-knowing murder and felony murder); *Coyle, supra,* 119 *N.J.* at 221, 574 *A.*2d 951 (noting that "a purposeful killing can be either murder or passion/provocation manslaughter").

 We reaffirm our adherence to the proposition that when a rational basis exists for a jury to convict a capital defendant of a non-death-eligible alternative form of homicide, a trial court should charge that offense in a manner that allows the jury to consider it simultaneously with death-eligible purposeful-or-knowing murder. That requirement affords us the necessary assurance that a capital jury has properly considered all available options before rendering a death-eligible verdict, an important safeguard in light of the "qualitative difference between the death penalty and other penalties." *Brown, supra,* 138 *N.J.* at 511, 651 *A.*2d 19 (quoting *State v. Bey,* 112 *N.J.* 123, 156, 548 *A.*2d 887 (1988) (*Bey II* )).

██ Here, the court explicitly told the jury on at least four separate occasions that it did not have to consider accomplice liability unless it first acquitted of own-conduct murder. Presented in that manner, the instructions improperly focused the jury's attention on the State's theory of the case and "had the potential to foreclose jury consideration," *Coyle, supra,* 119 *N.J.* at 222, 574 *A.*2d 951, of the non-death-eligible alternative. Moreover, the sequential instructions, standing alone, effectively required the jury to reject own-conduct murder in order to reach accomplice liability. That framework contravened our holding in *Brown, supra,* 138 *N.J.* at 509–22, 651 *A.*2d 19, that the own-conduct determination may be nonunanimous, in which event the penalty phase would be avoided.

 The finding of error does not end our inquiry. Rather, "[o]ur assessment of the prejudicial capacity of a sequential charge is grounded in the 'circumstances of the case.' " *Mejia, supra,* 141 *N.J.* at 484, 662 *A.*2d 308 (quoting *Zola, supra,* 112 *N.J.* at 406, 548 *A.*2d 1022). Here, because defendant did not object to the instructions at trial, we must determine whether the court's improper sequential charge was plain error possessing the clear capacity to bring about an unjust result. See *R.* 2:10–2; *State v. Harvey,* 151 *N.J.* 117, 153, 699 *A.*2d 596 (1997); *State v. Hock,* 54 *N.J.* 526, 538, 257 *A.*2d 699 (1969), *cert. denied,* 399 *U.S.* 930, 90 *S.Ct.* 2254, 26 *L. Ed.*2d 797 (1970).

██ We are fully satisfied that under the circumstances presented by this record any error in the court's sequential presentation of own-conduct murder and accomplice-liability murder was harmless. We ground this conclusion on the practical realization that based on the facts of this case, the alternatives of own-conduct murder and accomplice-liability murder presented the jury with one indivisible issue to resolve. Because only one individual pulled the shotgun's trigger, the jury's assessment of the own-conduct issue also served as the functional equivalent of a simultaneous deliberation on accomplice liability. The court made clear to the jury that the State had to prove beyond a reasonable

doubt that defendant committed the murder by his own conduct. Thus, the jury's finding beyond a reasonable doubt that defendant was the shooter necessarily reflected its consideration and rejection of the alternative theory of defendant as accomplice. Although the ideal instruction would have expressly required the jury to consider both theories simultaneously, we do not perceive any likelihood that the court's instructions affected the outcome of the jury's deliberations.

Moreover, a fair reading of the record reveals that defense counsel considered the jury's resolution of the own-conduct issue to constitute a simultaneous deliberation on accomplice-liability murder. During the court's review of the verdict sheet with the jury, the State noted the lack of a specific accomplice-liability option on the verdict sheet and asked the court to highlight that issue:

[State]: [Y]ou have charged them about accomplice liability, but nowhere on here— and saying he can either be guilty of murder [as a principal] or of murder as an accomplice, yet it's not been—it's not on the verdict sheet as a choice. So, it may be confusing to them.

[Defense]: I object to that, your honor.

[State]: Where that is applicable, the accomplice liability is applicable.

[Defense]: I think you explained it. To highlight it now it suggests, I feel, it's the proper verdict. I think it's been properly explained to them. The verdict sheet properly reflects it and I strenuously object.

The Court: I think you're right. I think it's been explained clearly and I think that's implicit and clear in the own conduct portion.

Defense counsel's objection is most likely indicative of a trial strategy aimed at avoiding a compromise verdict and securing a complete acquittal for defendant. Nevertheless, the clear implication remains that defense counsel considered the own-conduct question to encompass adequately the issue of accomplice liability.

In view of our conclusion that the sequential charge did not prejudice defendant, we need not address the State's contention at oral argument that there was not a rational basis in the evidence for the court to instruct the jury on accomplice-liability murder. Indeed, the rational-basis test poses a low threshold for a defendant to meet. *Mejia, supra,* 141 *N.J.* at 489, 662 *A.*2d 308 (citing

State v. Crisantos, 102 N.J. 265, 278, 508 A.2d 167 (1986)); Harris, supra, 141 N.J. at 549, 662 A.2d 333. However, we note the lack of evidence in this record supporting the conclusion that anyone other than defendant was the principal actor in this murder. Defendant borrowed the gun from Kaighn and stored it in Shiplee's trunk. On the night of the murder, he pursued several other possible rides from the Columbia Cafe before leaving with Mills—suggesting that whoever drove with defendant was unimportant to the execution of defendant's plan. Most importantly, defendant's inculpatory statements on multiple occasions revealed his status as the triggerman. Conversely, aside from the fact that Mills accompanied defendant from the Columbia Cafe, no evidence adduced at trial suggested that he played more than a minor role in the murder of Keith Donaghy.

In capital cases that present a jury question whether a defendant is guilty of death-eligible own-conduct murder or accomplice-liability murder, the trial court, after instructing the jury on the requisite elements of the charged offenses, should instruct the jury first to determine whether the defendant is guilty of purposeful-or-knowing murder. See Gerald, supra, 113 N.J. at 100, 549 A.2d 792. The jury should be instructed that only if it unanimously reaches a guilty verdict on that offense should it then determine whether the defendant committed the murder "by his own conduct" or, alternatively, as an accomplice, the charge emphasizing that because those alternatives are mutually exclusive the jury should consider them simultaneously. During the course of its instructions, the court should make clear to the jury that it need not be unanimous on the own-conduct determination, and it must inform the jury of the legal consequences of its own-conduct finding. Brown, supra, 138 N.J. at 514, 651 A.2d 19.

We emphasize that the jury's initial determination of guilt or innocence on the charge of purposeful-or-knowing murder is not intended to resolve whether the defendant acted as principal or accomplice. Only subsequent to a guilty verdict of purposeful-or-knowing murder will the jury specifically consider what form of

murder—accomplice-liability or own-conduct—supports the murder conviction. Our case law supports that view of the jury's deliberations. *See, e.g., Mejia, supra,* 141 *N.J.* at 486–87, 662 *A.*2d 308 (suggesting that whether defendant intended to cause death or serious bodily injury resulting in death be considered after initial finding of guilt on unspecified form of murder); *Brown, supra,* 138 *N.J.* at 519, 651 *A.*2d 19 ("We do not accept the State's premise that to convict defendant of purposeful or knowing murder, the jury was required unanimously to agree that the State had proved a specific theory of liability beyond a reasonable doubt."); *State v. Parker,* 124 *N.J.* 628, 633–34, 592 *A.*2d 228 (1991) (recognizing jury unanimity on theory of defendant's guilt is not required), *cert. denied,* 503 *U.S.* 939, 112 *S.Ct.* 1483, 117 *L. Ed.*2d 625 (1992).

B. Jury Knowledge of Nonunanimity Option

Defendant asserts that inconsistent instructions regarding the need for unanimity left the jury confused and under the impression that it had to be unanimous on the own-conduct determination to return a valid murder conviction. In addition to the sequential charge on accomplice-liability murder, the court consistently emphasized the need for jury unanimity:

> As I previously instructed, any verdicts rendered must be unanimous on any of these charges, whether it be murder, aggravated manslaughter, reckless manslaughter, [or] accomplice liability. Your verdicts must be 12 to 0 to be a verdict. I'm going to give you further instructions on that as we go along. All 12 jurors must agree that he's either guilty or not guilty of any one of the charges that you are considering.

The court reminded the jury of the need to be unanimous on at least three other occasions during its charge. Nonetheless, the court also made clear that the specific form of murder and the own-conduct determination were "special findings" that need not be unanimous:

> If you have a reasonable doubt as to whether the killing was by his own conduct or if you are unable to reach a unanimous decision beyond a reasonable doubt as to whether the defendant committed the murder by his own conduct, as distinguished from being responsible for it as an accomplice, that is a permissible final verdict on this issue and that, again, would result in the imposition of a mandatory sentence

for murder of at least 30 years in prison, up to life, but at least 30 [years] without parole.

After reminding the jury that it had to be unanimous with regard to its verdicts, the court again stressed the acceptability of a nonunanimous own-conduct determination near the end of its instructions:

> As to the special questions that I've already discussed with you and which I'll go over with you again on the verdict sheet, not as to guilty or not guilty, but the special questions, regarding the specific form of murder, if you find the defendant guilty of murder, and regarding the by his own conduct question, if you have found him guilty of murder and if it becomes appropriate for you to reach that question, those do not have to be unanimous, as I already explained to you.

The verdict sheet reiterated that direction. In pertinent part, it read:

> **IF YOU HAVE FOUND DEFENDANT GUILTY OF MURDER AND CHECKED (1) ABOVE THEN CHECK "a" OR "b" BELOW.**
>
> a. BY HIS OWN CONDUCT -------------/_____/
>
> (Case will proceed to penalty phase for a decision by you as to whether the punishment is death or imprisonment for at least 30 years.)
>
> b. NOT BY HIS OWN CONDUCT OR UNABLE TO AGREE UNANIMOUSLY ON "a"------------------/_____/
>
> (Defendant will receive a mandatory sentence of at least 30 years in prison without parole.)

The court also made the permissibility of a nonunanimous own-conduct determination clear when it reviewed the verdict sheet with the jury:

> [M]aybe you all agree on [own conduct] or that you're unable to agree unanimously whether it was by his own conduct or not beyond a reasonable doubt and that's okay if that's your finding and if you make that finding, regardless of whether it's 11 to 1 or 6 to 6 one way or the other, we're not asking what the vote would be, but if that's your finding then you would check that, that you either concluded that it was not by his own conduct or that you're simply unable to unanimously agree whether it's been proven beyond a reasonable doubt that it was by his own conduct and if that's your finding, then he's still guilty of murder and he would still get the minimum mandatory prison sentence of at least 30 years without parole, but the case would not go into a second phase for determination of [a] possible death penalty.

After reviewing that aspect of the verdict sheet, the court added: "That's the murder part. Is there anybody, if it's unclear tell me. If after you're deliberating there's something unclear

with this or anything else let me know and I'll bring you out and try to reexplain it, try to clear it up."

A charge "is a road map to guide the jury, and without an appropriate charge a jury can take a wrong turn in its deliberations." *Brown, supra,* 138 *N.J.* at 522, 651 *A.*2d 19 (quoting *State v. Martin,* 119 *N.J.* 2, 15, 573 *A.*2d 1359 (1990)). We regard clear and accurate instructions as an essential ingredient of a fair trial. *See, e.g., Brown, supra,* 138 *N.J.* at 522, 651 *A.*2d 19 (citing *State v. Martini,* 131 *N.J.* 176, 271, 619 *A.*2d 1208 (1993), and *Martin, supra,* 119 *N.J.* at 15, 573 *A.*2d 1359). In the context of a capital case, adequate instructions are crucial in view of "the jury's responsibility to determine whether a defendant will live or die." *Mejia, supra,* 141 *N.J.* at 487, 662 *A.*2d 308 (quoting *Bey II, supra,* 112 *N.J.* at 162, 548 *A.*2d 887). Moreover, clearly erroneous instructions usually are considered "poor candidates for rehabilitation under the harmless error philosophy." *Brown, supra,* 138 *N.J.* at 522, 651 *A.*2d 19 (quoting *State v. Harmon,* 104 *N.J.* 189, 213, 516 *A.*2d 1047 (1986)); *State v. Simon,* 79 *N.J.* 191, 206, 398 *A.*2d 861 (1979).

In *Brown* we concluded that jury unanimity was required for the State to prove beyond a reasonable doubt that a defendant committed a murder by his own conduct. 138 *N.J.* at 510–11, 651 *A.*2d 19. Conversely, "unanimity is not required to support a verdict that a defendant guilty of murder *did not* commit the murder by his own conduct." *Id.* at 511, 651 *A.*2d 19. We grounded this distinction on our recognition of the qualitative difference between a death sentence and imprisonment, and on our acceptance of the principle that "non-unanimous findings should be given legal effect when those findings weigh in favor of the imposition of a life sentence" rather than the death penalty. *Ibid.* (citing *Bey II, supra,* 112 *N.J.* at 156, 548 *A.*2d 887). When a jury is unable to agree unanimously that a defendant committed a murder by his own conduct, that constitutes a valid final verdict resulting in a mandatory sentence of at least thirty years' imprisonment under *N.J.S.A.* 2C:11–3b. *Ibid.*

In *Brown,* the trial court omitted an instruction informing the jury that nonunanimity on the own-conduct determination was permissible and would constitute a valid verdict. *Id.* at 514–16, 651 *A.*2d 19. Additionally, the court told the jury that if it was unable to agree unanimously that defendant committed the murder by his own conduct, it instead had to be unanimous that defendant committed the murder as an accomplice or co-conspirator. *Id.* at 514, 651 *A.*2d 19. Because the facts in *Brown* indicated that there was a basis for finding that the defendant had not committed the murder by his own conduct, "the failure to inform the jury that it had the option of returning such a [nonunanimous own-conduct] verdict was clearly capable of prejudicing defendant." *Id.* at 526, 651 *A.*2d 19.

 We are satisfied that this court's instructions and the verdict sheet adequately imparted to this jury its ability to be nonunanimous on whether defendant committed the murder by his own conduct. Concededly, the court stressed the nonunanimity option near the end of its instructions, only after having focused the jury's attention on the need to be unanimous with regard to each of the underlying offenses.

 However, unlike *Brown,* in which the jury remained uninformed about its ability to be nonunanimous on the own-conduct issue, *id.* at 514, 651 *A.*2d 19, the court here on at least three separate occasions stressed to the jury that it had the option to return a non-unanimous own-conduct verdict. That contingency also was set forth clearly on the verdict sheet. Moreover, the court told the jury that the return of a nonunanimous own-conduct verdict would result in a valid murder conviction carrying a sentence of at least thirty years in jail. Rather than isolate certain aspects of the instructions, we are obligated to view the charge as a whole. *State v. Delibero,* 149 *N.J.* 90, 106, 692 *A.*2d 981 (1997); *State v. Ramseur,* 106 *N.J.* 123, 280, 524 *A.*2d 188 (1987), *aff'd sub nom. Ramseur v. Beyer,* 983 *F.*2d 1215 (3d Cir.1992), *cert. denied,* 508 *U.S.* 947, 113 *S.Ct.* 2433, 124 *L. Ed.*2d 653 (1993); *State v. Wilbely,* 63 *N.J.* 420, 422, 307 *A.*2d 608 (1973).

Doing so here, we are unable to conclude that the charge was "clearly capable of misleading the jury." *Brown, supra,* 138 *N.J.* at 526, 651 *A.*2d 19 (quoting *Harmon, supra,* 104 *N.J.* at 213, 516 *A.*2d 1047). We are confident that this jury was not confused concerning its ability to return a nonunanimous own-conduct finding.

### III

#### Publicity and Pretrial Issues

A. Impanelment of Salem County Jury, Midtrial *Voir Dire,* and Postverdict Polling of the Jury

Defendant advances a three-pronged attack on the trial court's responses to the risk that prejudicial publicity affected the integrity of the jury's verdicts. Defendant contends that the court abused its discretion by empaneling a jury from Salem County instead of Cumberland County; that it committed reversible error by failing to conduct individualized *voir dire* regarding the jury's exposure to midtrial publicity; and that it erred by not individually polling the jurors after the death sentence about their knowledge of the other murder with which defendant was charged.

██ Unlike our recent decision in *State v. Harris,* 156 *N.J.* 122, 716 *A.*2d 458 (1998), this case does not involve saturated media coverage creating a presumption of prejudice to a defendant. *See State v. Koedatich,* 112 *N.J.* 225, 273, 548 *A.*2d 939 (1988)(*Koedatich I* ), *cert. denied,* 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L. Ed.*2d 803 (1989); *State v. Biegenwald,* 106 *N.J.* 13, 33, 524 *A.*2d 130 (1987)(*Biegenwald II* ). Where a presumption of prejudice has arisen in a capital case, the appropriate response is to transfer the trial to another county. *Harris, supra,* 156 *N.J.* at 134, 716 *A.*2d 463.

Rather, defendant here raises a more discrete claim attacking the sufficiency of the measures the court adopted to prevent prejudice. Although defendant concedes that impanelment of a Salem County jury reduced the level of prejudice against defen-

dant, he argues that the court's duty was to minimize prejudice, an obligation that would have been effectuated if the court selected jurors from Cumberland County. As noted, defendant was to be tried separately for the October 31, 1993 stabbing death of Ronald Pine, another gas station attendant. Much of the media coverage, although factual and not inflammatory in nature, contained references to the second murder. That reporting was contained primarily in *The Philadelphia Inquirer* (Philadelphia and southern New Jersey), *The Courier Post* (Burlington, Camden, and Gloucester Counties), *The Gloucester County Times* (Gloucester County), and *Today's Sunbeam* (Salem County). Recognizing the obvious prejudice to defendant if jurors with knowledge of his implication in the second murder sat on the jury, the trial court began jury selection in Gloucester County believing that *voir dire* would eliminate those with knowledge of the second murder.

Problems associated with Gloucester County jury selection soon became apparent. Most significantly, it was difficult to determine whether potential jurors knew of the second murder without asking the question directly. Defendant moved for a change of venue. Citing the relatively limited and non-inflammatory coverage of the murders, and because the coverage was concentrated some two years prior to jury selection, the court denied the motion without prejudice. However, the court's faith in the Gloucester County jury pool was soon undermined. A number of jurors who were excused for other reasons revealed during post-dismissal questioning their knowledge of the second murder. The indirect manner in which *voir dire* attempted to elicit a potential juror's knowledge of the second murder obviously was ineffective. After conducting extensive *voir dire* in Gloucester County over several weeks, the court halted jury selection:

> It's my conclusion based upon between 150 and 200 jurors that have been interviewed that I cannot satisfy myself as the individual who is vested with this broad discretionary power and upon whom a reviewing court would rely to a significant extent and pay significant deference to in determining whether or not the voir dire was able to assure the selection of an impartial jury.
>
> I cannot say that I have sufficient confidence in the results of this voir dire to be so assured. As probing as it's been, with the considerable efforts of counsel on

both sides, as well as by this Court, I simply do not have the confidence level that I feel I should have to be assured that this process will yield a fair and impartial jury, consisting of no one who is likely to have heard about the other murder and this defendant's implication in it.

There have been a number of jurors, prospective jurors, who were very close to being qualified, who almost offhandedly or as an afterthought acknowledged that they knew something about the other murder. Sometimes it was vague information.

. . . .

The fact that in every article without exception, although the number of articles has not been that great, it really hasn't, but the fact that in every article these 2 cases have been linked and the results of the publicity come through to me with these prospective jurors, that there is a pervasive knowledge among the citizens of this county that the same person is charged in these 2 gas station murders, they're just linked, from the day he was arrested they've been linked, because I cannot ask detailed enough questions, nor can counsel, to ferret out that information with reasonable assurance, because by going too far with pointed questions prejudice would be created and because of that it is my conclusion that the motion for a change of venue should be granted, in order to avoid the likelihood of prejudice to the defendant resulting from pretrial publicity.

After concluding that a change of venue was necessary, the court stated that a further decision would be made regarding whether to move the trial or simply impanel a foreign jury to sit in Gloucester County. Defense counsel expressed no preference for one option over the other, explaining that "[t]he issue is the purity of the jurors we get, not where the court is held." The court accepted that concession and, taking into account the convenience to witnesses, family members and attorneys, concluded that a foreign jury would be impaneled to hear the case in Gloucester County.

Defendant contended that the proper choice would be a jury from Cumberland County, because media penetration there was less intensive than in surrounding counties. The court, however, relying on the Appellate Division's decision in *State v. Harris*, 282 *N.J.Super.* 409, 660 *A.*2d 539 (1995), concluded for several reasons that Salem County would be the source of the foreign jury. Although the murders were the subject of more press coverage in Salem County than in Cumberland County, the court observed that the articles published in Salem County's *Today's Sunbeam* were shorter, fewer in number, and less prominently placed than

articles in the other papers. Additionally, the court noted that Salem County possessed a reserve juror panel sufficient to satisfy the court's need for a large jury pool, whereas Cumberland County would have required several months to assemble an adequate pool. Moreover, the demographic makeup of Salem County approximated that of Gloucester County more closely than Cumberland County.

Finally, the court determined that because of the possibility of a second trial for the Ronald Pine murder, Cumberland County should be reserved for that case. The court reasoned that in view of its closer link to Gloucester County, Salem County would experience publicity no matter where the first trial was held. Thus, Salem would be a problematic location for a second trial. Conversely, holding the first trial in Gloucester County with a Salem County jury would be unlikely to result in significant publicity in Cumberland County, which is more detached from newsworthy events in Gloucester County, thereby preserving Cumberland for the possible second trial.

 Because a criminal defendant is guaranteed the right to an impartial jury, *Irvin v. Dowd*, 366 *U.S.* 717, 722, 81 *S.Ct.* 1639, 1642, 6 *L. Ed.*2d 751, 755 (1961), a trial court must observe significant precautions to minimize adverse pretrial and midtrial publicity that is capable of affecting juror perception of the case. *State v. Williams*, 93 *N.J.* 39, 63, 459 *A.*2d 641 (1983) (*Williams I* ). Whether a "realistic likelihood of prejudice from pretrial publicity," *id.* at 67–68 n. 13, 459 *A.*2d 641, exists is the standard to be applied by trial courts in resolving what precautionary measures to take. Available options include a change of venue, selection of a foreign jury, and augmentation of the jury pool. *Id.* at 67, 459 *A.*2d 641; *Biegenwald II, supra,* 106 *N.J.* at 32, 524 *A.*2d 130; *see also R.* 3:14–2 (authorizing change of venue or foreign jury if "a fair and impartial trial cannot otherwise be had"). A court must also conduct adequate *voir dire* to guard against the dangers of hidden bias. *Williams I, supra,* 93 *N.J.* at 68, 459 *A.*2d 641; *Biegenwald II, supra,* 106 *N.J.* at 32, 524 *A.*2d

130 (noting that "searching *voir dire* examinations" are means of protecting defendant's constitutional rights). We place great reliance on a trial court's *voir dire* examinations in determining a juror's actual bias. *Koedatich I, supra,* 112 *N.J.* at 274, 548 *A*.2d 939 (citing *Patton v. Yount,* 467 *U.S.* 1025, 1038–39, 104 *S.Ct.* 2885, 2892–93, 81 *L. Ed.*2d 847, 858 (1984)).

█ In criminal prosecutions in which the level of pretrial publicity does not justify a trial court in presuming prejudice to the defendant, we ordinarily will affirm a trial court's determinations regarding appropriate prophylactic measures unless they constitute an abuse of discretion. See *State v. Marshall,* 123 *N.J.* 1, 76, 586 *A*.2d 85 (1991), *cert. denied,* 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L. Ed.*2d 694 (1993). Here, the trial court relied on *Harris, supra,* 282 *N.J.Super.* at 421, 660 *A*.2d 539, an Appellate Division decision that adopted the American Bar Association's recommended test to determine the source of a foreign jury or the appropriate venue. That test is comprised of five factors:

(1) The nature and extent of pretrial publicity, if any, in the proposed venue;

(2) The relative burdens on the respective courts in changing to the proposed venue;

(3) The relative hardships imposed on the parties, witnesses, and other interested persons with regard to the proposed venue;

(4) The racial, ethnic, religious and other relevant demographic characteristics of the proposed venue, insofar as they may affect the likelihood of a fair trial by an impartial jury;

(5) Any other factor which may be required by the interests of justice.

[*Ibid.* (quoting *Criminal Justice Standards: Trial by Jury ABA Criminal Justice Section Standard* 15–1.4 (3d ed.1993)).]

█ We are confident that impanelment of a Salem County jury was an appropriate exercise of the court's discretion. First, as this was not a case of sustained, inflammatory publicity, *see Harris, supra,* 156 *N.J.* at 145, 716 *A*.2d 469, defendant concedes that a change of venue was not mandatory. Although Salem County was shown to have a higher level of publicity than Cumberland County, it was by no means inundated with publicity about the murders. Also, Cumberland County's lack of a large reserve juror pool weighed in favor of empaneling a Salem County

jury. Additionally, the demographic makeup of Salem more closely reflected that of Gloucester County. The court meticulously identified and discussed each relevant factor and concluded that Salem County was the appropriate source for defendant's jury. We agree.

Moreover, the searching *voir dire* conducted by both the court and counsel in Salem County reassures us that the jury considering defendant's case was fair and impartial. In addition to filling out a thirteen-page questionnaire, each potential juror who revealed his or her familiarity with either the defendant or any facts of the case was automatically excused. The court took that extra precaution even though we have not mandated automatic excusal for jurors whose impartiality is intact but who may have been exposed to publicity about some aspects of a pending prosecution. *Marshall I, supra*, 123 *N.J.* at 77, 586 *A.*2d 85. In sum, we have no reason to believe "that any juror was so tainted by pretrial publicity as to affect the deliberative process." *Id.* at 78, 586 *A.*2d 85.

During the trial itself, the court continuously admonished the jury to avoid any exposure to publicity about the case. The following comment is representative of the court's reminders to the jury:

> Continue please, to follow the instructions that I've given you all along. Do not discuss this case. Do not read anything about it. There's been quite a bit of coverage of this case. Be sure if you want to read the papers you have someone screen those papers for you ahead of time and pull out or cut out any articles that deal with this case in any way directly or indirectly.

Additionally, on one occasion during the penalty phase the court stated on the record that it ordered sheriff's officers to place themselves in front of a newspaper vending box that contained a newspaper with a headline about the case.

On at least three instances during the trial defense counsel requested individualized *voir dire* to determine whether jurors were exposed to prejudicial publicity. The court declined in each instance, choosing instead to conduct a collective *voir dire* of the

jury. None of the jurors volunteered that they had heard or read anything about the case.

During the penalty-phase deliberations, defense counsel requested that the court conduct individualized *voir dire* after the return of a verdict, and to ask each juror directly whether they had received any information about the second murder, either before or during the trial. The court denied this request, characterizing it as "speculative and not a realistic possibility." The court discharged the jury without having inquired, either individually or collectively, about their knowledge of the second murder.

Defendant contends that the court erred in failing to conduct individualized *voir dire* during the trial, and by rejecting defendant's request to poll the jury individually after its penalty-phase verdict to uncover any possible knowledge of the Pine murder. In the context of another death penalty case, we recently stated the principles that guide us in resolving these claims of prejudice based on alleged prejudicial publicity:

> Of particular significance here is that aspect of impartiality mandating "that the jury's verdict be based on evidence received in open court, not from outside sources." As expressed by Justice Holmes, "[t]he theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." ... The Court has consistently required trial courts to protect both jurors and their deliberations from illegitimate influences that threaten to taint the verdict. [T]rial judges must "seek out and expose outside factors impinging upon the jury's freedom of action and its impartiality and essential integrity."
>
> [*Harris, supra* 156 *N.J.* at 142, 716 *A.*2d 467–68 (quoting *State v. Bey,* 112 *N.J.* 45, 75, 548 *A.*2d 846) (1988) (*Bey I* ) (citations omitted).]

We address the problem of midtrial publicity in much the same manner as prejudicial pretrial publicity. *Bey I, supra,* 112 *N.J.* at 74–78, 548 *A.*2d 846; *Williams I, supra,* 93 *N.J.* at 63, 459 *A.*2d 641. Whether midtrial *voir dire* is necessary to uncover jury exposure to prejudicial publicity depends upon (1) the publicity's ability to prejudice the defendant, and (2) whether there is a "realistic possibility that such information may have reached one or more of the jurors," focusing on the "extent, notoriety, and prominence of the media coverage." *Bey I, supra,* 112 *N.J.* at 83–

86, 548 *A*.2d 846. Although noting that individualized *voir dire* was more likely to ferret out a juror's exposure to prejudicial publicity than an *en banc* examination, we declined to adopt a hard and fast rule mandating individualized jury *voir dire*. *Id.* at 86–87 n. 26, 548 *A*.2d 846.

In the context of this case, we find no error in the court's collective *voir dire* of the jury during the trial. We note that this was a trial that did not engender extensive publicity. Moreover, the "realistic possibility that [prejudicial publicity] may have reached one or more of the jurors," *id.* at 86, 548 *A*.2d 846, was minimized by the court's extensive pretrial *voir dire* and continuous instructions throughout the trial admonishing the jurors to avoid any publicity regarding the case. Unlike *Bey I, supra,* 112 *N.J.* at 79–80, 548 *A*.2d 846, this was not a case in which the court simply told the jurors to come forward if they were ever exposed to publicity; the court did conduct collective *voir dire* on several occasions during the course of the trial. We find the court's discharge of its obligations in this regard to be cautious and conscientious, and do not perceive any abuse of discretion.

Similarly, we find no error in the court's refusal to poll the jurors individually after the penalty-phase verdict to determine whether they had been exposed to publicity regarding the other murder. We have previously rejected similar contentions. See *State v. Loftin,* 146 *N.J.* 295, 382, 680 *A*.2d 677 (1996)(*Loftin I* ) and *Koedatich I, supra,* 112 *N.J.* at 288–89, 548 *A*.2d 939. We note that defendant's claim here is weaker than those presented in *Loftin I* and *Koedatich I* because he has not presented any evidence suggesting that any juror obtained prejudicial information. Defendant's assertion that this case is different because the request to poll was made *before* the jury was discharged is of no moment. "Good cause" must still be shown to poll jurors after a verdict under *Rule* 1:16–1, a showing that defendant has failed to make.

In sum, defendant has not offered a persuasive reason either to question the adequacy of the trial court's precautionary measures

or to undermine our confidence in the integrity of defendant's jury or in their verdict.

### B. Disqualification of Susan Vasile

We are fully satisfied that Susan Vasile was properly excluded from serving on defendant's jury. After a long and searching *voir dire* examination, the court concluded that Vasile's "extreme reluctance to acknowledge that she'd be able to vote for the death penalty ... would substantially impair her ability to function."

Vasile was examined thoroughly by the court, the prosecutor, and defense counsel. Defendant points out that although Vasile expressed cautious views regarding the death penalty, she did say that she would be able to follow the law as instructed. However, Vasile repeatedly equivocated on whether she could vote to impose the death penalty, frequently framing her responses to indicate that she "would like to think" she could vote for the death penalty but that it would depend on the facts of the case. When confronted with a fact pattern justifying imposition of the death penalty under New Jersey law, Vasile still could not say that she could impose a sentence of death. Indeed, Vasile said flatly that if she voted for a death sentence, "I would feel like I'm committing a murder."

In *Ramseur, supra,* 106 *N.J.* at 256, 524 *A.*2d 188, we adopted the *Adams/Witt* test for excluding jurors for cause. *Wainwright v. Witt,* 469 *U.S.* 412, 105 *S.Ct.* 844, 83 *L. Ed.*2d 841 (1985); *Adams v. Texas,* 448 *U.S.* 38, 100 *S.Ct.* 2521, 65 *L. Ed.*2d 581 (1980). That test requires a finding whether, in the court's discretion, a prospective juror's beliefs or attitudes would substantially interfere with his or her deliberative duties.

This prospective juror repeatedly equivocated concerning her ability to impose the death penalty. She also volunteered the belief, without prompting from the court or counsel, that she would feel like a "murderer" if she voted to impose the death

penalty. We therefore find the court's dismissal of Vasile to be an appropriate exercise of its discretion.

## IV

### Guilt–Phase Issues

#### A. Prosecutorial Misconduct in Guilt–Phase Summation

The State's case was based almost exclusively on the inculpatory statements made by defendant after the murder. The State presented evidence that defendant and Mills sought to borrow a car and that both men left the Columbia Cafe in Renee Burkhardt's car, with Michael Mills in the driver's seat. The State also provided circumstantial evidence suggesting that the two men had a gun in their possession, and that they returned to the bar roughly one hour after they had left. However, the State presented no evidence other than the fact that Donaghy was murdered and robbed, along with defendant's later descriptions of the murder, to show what actually occurred during that time frame.

Nevertheless, during the State's summation the prosecutor sought to provide some of the missing pieces:

> So what happens? Around 8:00 Mills and [defendant] pull out. Mills is the driver. Somewhere along that route this man's first act of intent to kill, first act of purpose, preplanned, premeditated, intent to kill occurs. He takes the shotgun and loads it with the slug.

Defense counsel immediately objected, asking for support in the record justifying the comment. The court stated that it was a permissible inference to be drawn, and ordered defense counsel to sit down.

The prosecutor continued:

> Well, maybe he doesn't do it during the ride, but the act of putting this slug into this weapon is an intent, an intent to use this gun, use it with a slug. It's not the bird shot, or whatever you would use for small game. This is a slug, this is a three quarter ounce piece of lead. That's his first act of intent.
>
> . . . .
>
> [T]his man and Mills are headed towards the gas station with him intent on killing Keith. As [Wr]igley puts it, he wanted to feel what it was like to kill. And what

you find from the pictures and the [crime-scene] video is that's what his intent was when he went in that station, first to kill.

What do they do? They drive down the front. Here is Ogden Road. They drive in front of the station. And here are the windows. Keith is seated here. They can see that he's alone, seated there doing his job. They continue down. And they go down the road between the Texaco and—

Again, defense counsel objected, asking for support in the record. The court admonished the prosecutor not to ask for speculation. The prosecutor continued: "[Mills and defendant] [p]ulled down Georgetown Road and park. Mills is going to—he's going to be the getaway driver. What does [defendant] do? It's loaded—not now—." Counsel objected for the third time. The court characterized the statement as a permissible inference to ask the jury to draw based on facts in the record. At side bar, the court recited the facts contained in the record supporting such an inference:

The Court: Fact one, Mills and [defendant] leave the bar together. Fact two, they take a car to which Mills got the keys and was seen as the driver driving it when it left the bar. Fact three, they returned to the bar and Mills hands the girl back the keys. Fact four, [defendant] admits to several people that while they were out he killed this guy.

I think it is a logical and reasonable inference that can be drawn, doesn't have to be drawn, but is a permissible and reasonable and logical inference that he was the driver and [defendant] was the killer.

[Defense]: How about that he said he would be the getaway car driver?

[Prosecutor]: I never said that.

The Court: I don't think he did, either.

Defense counsel then declined the court's offer to recite the facts for the benefit of the jury. The prosecutor resumed his summation:

The second act of his intent of this premeditation to kill is, Sergeant Hannigan says you can pull the trigger all day long on this shotgun and it doesn't go off. All day long. What do you have to do in order for the shotgun to fire? You have to cock the hammer back. That act is intent to use this to kill someone, armed with the pumpkin ball slug in this gun. And that is done before he gets into the gas station, because he does not have time once he's in the station to cock this gun. That is done while he is on his way into the station.

And how does he go? He goes along this way, from the bays, he sneaks across, and there is the door. Keith, who is looking out the windows, doesn't see him because he's coming from the blind side. And what does he do? With the hammer

cocked, he shoulders into the door. Remember, it opens inside, from the inside. *He shoulders in the door like this.*

The prosecutor then described the shooting, and stated:

It take[s] seconds and he's gone and back in the car with Mills. And they head towards National Park. Keith, his body found by Mrs. Smolenski and the others.

And why this route? On the way back to National Park they ditch the gun in the creek. Mills is driving. . . . Mills drops [defendant] off, maybe at his house. . . .

Given the order of summation, defense counsel never responded to the statements made by the prosecutor. Nor did defense counsel request a curative instruction or a mistrial. In fact, defense counsel offered a curious concession upon completion of the State's closing:

I had a series of objections during Mr. Warburton's closing, none of which I believe would have amounted to reversal [sic] error, anything close to it. . . . I need to make, merely to complete the record, what I think is my obligation as counsel. Judge, I think cocking the gun in the car is pure speculation, not based on any fact I can think of.

Defendant asserts that the State's summation "brought forth the ghost of Michael Mills" by informing the jury of facts that could have been known only by Mills. Mills's statement to the police was inadmissible in view of his suicide. Defendant contends that the seriousness of the prosecutor's improper comments is compounded because the comments went to two critical issues in the trial: whether defendant committed the murder by his own conduct, that is, whether defendant and not Mills was the shooter, and, assuming defendant was the shooter, whether the shooting was accidental or intentional.

A prosecutor is "entitled to sum up the State's case graphically and forcefully." *State v. Marquez,* 277 *N.J.Super.* 162, 171, 649 *A.*2d 114 (App.Div.1994)(quoting *State v. Johnson,* 31 *N.J.* 489, 510–11, 158 *A.*2d 11 (1960)), *certif. denied,* 141 *N.J.* 99, 660 *A.*2d 1198 (1995). Moreover, we have recognized that the highly emotional nature of criminal trials often tests a prosecutor's duty to remain strictly within the bounds of propriety. *State v. Bucanis,* 26 *N.J.* 45, 56, 138 *A.*2d 739, *cert. denied,* 357 *U.S.* 910, 78 *S.Ct.* 1157, 2 *L. Ed.*2d 1160 (1958). Nevertheless, a prosecutor's sum-

mation "is limited to commenting upon the evidence and the reasonable inferences to be drawn therefrom." *State v. Johnson,* 120 *N.J.* 263, 296, 576 *A.*2d 834 (1990)(quoting *Bucanis, supra,* 26 *N.J.* at 56, 138 *A.*2d 739); *see also Berger v. United States,* 295 *U.S.* 78, 88, 55 *S.Ct.* 629, 633, 79 *L. Ed.* 1314, 1321 (1935)(noting that although prosecutor "may strike hard blows, he is not at liberty to strike foul ones"); *ABA Standards for Criminal Justice* § 3–5.8(a)(2d ed. 1980)("It is unprofessional conduct for the prosecutor intentionally to ... mislead the jury as to the inferences it may draw."). Indeed, a prosecutor's primary obligation is not to win convictions but to see that justice is done. *State v. Farrell,* 61 *N.J.* 99, 104, 293 *A.*2d 176 (1972).

Particularly in the delicate context of a capital trial, conduct that falls short of a prosecutor's special duty to seek justice will be scrupulously reviewed. *Biegenwald II, supra,* 106 *N.J.* at 40, 524 *A.*2d 130. A prosecutor is guilty of misconduct if he implies to the jury that he possesses knowledge beyond that contained in the evidence presented, or if he reveals that knowledge to the jury. *State v. Rose,* 112 *N.J.* 454, 519, 548 *A.*2d 1058 (1988). Nevertheless, prosecutorial misconduct will not serve as the basis for reversal unless it was so egregious as to work a deprivation of a defendant's right to a fair trial. *Ramseur, supra,* 106 *N.J.* at 322, 524 *A.*2d 188; *see also Zola, supra,* 112 *N.J.* at 426, 548 *A.*2d 1022 (noting that prosecutorial misconduct is not reversible error unless it deprived defendant of fair trial). In resolving whether the misconduct is prejudicial and thus denied defendant a fair trial, we will consider whether counsel registered a timely objection, whether the remark was withdrawn promptly, and whether the court struck the remarks and ordered the jury to disregard them. *Ramseur, supra,* 106 *N.J.* at 323, 524 *A.*2d 188; *State v. Bogen,* 13 *N.J.* 137, 141–42, 98 *A.*2d 295, *cert. denied,* 346 *U.S.* 825, 74 *S.Ct.* 44, 98 *L. Ed.* 350 (1953).

In *State v. Wilson,* 128 *N.J.* 233, 242, 607 *A.*2d 1289 (1992), we found improper a prosecutor's statement that he would not provide leniency to a State witness because that witness "was part of"

the murder, when no testimony supported that assertion. Although that assertion led to the objectionable inference that the witness had no self-serving reason to testify for the State, we observed that the issue whether the witness had hoped to secure favorable treatment in exchange for his testimony was placed in dispute before the jury, and "contested to an extent sufficient to minimize the impact of the prosecutor's infraction." *Id.* at 243, 607 *A.2d* 1289 (quoting *Marshall I, supra,* 123 *N.J.* at 157, 586 *A.2d* 85). Thus, we found no reversible error. *Ibid.*

In *Rose, supra,* we concluded that the cumulative effect of numerous prosecutorial improprieties required reversal of a death sentence. 112 *N.J.* at 523, 548 *A.2d* 1058. The most egregious improprieties included the prosecutor's intimation to the jury that it had no responsibility for defendant's death sentence because its duty was to weigh evidence and "[t]he law then takes over." *Id.* at 510, 548 *A.2d* 1058. In addition, the prosecutor warned the jury that a death sentence was necessary to prevent defendant from murdering again, *id.* at 520, 548 *A.2d* 1058, and suggested that a sentence other than death would violate the law. *Id.* at 523, 548 *A.2d* 1058. Moreover, the prosecutor exhorted the jury to "send a message" by delivering a death sentence. *Id.* at 520, 548 *A.2d* 1058. Without support in the record, the prosecutor also suggested that defense experts had fabricated testimony, that the prosecutor could have produced ten experts to testify differently than the defense experts, and that defendant had extorted food from other inmates while in prison. *Id.* at 518–19, 522, 548 *A.2d* 1058; *see also State v. Clausell,* 121 *N.J.* 298, 342, 580 *A.2d* 221 (1990)(criticizing as beyond the record prosecutor's assertion that defendants attempted to come "through the door and massacre the family").

We are satisfied that the prosecutor's comments in this case are less prejudicial than were the prosecutor's statements in *Rose, supra,* 112 *N.J.* at 510–14, 518–24, 548 *A.2d* 1058. At the outset, we note that defense counsel's subsequent concession that none of the prosecutor's remarks "would have amounted to rever-

sal [sic] error, anything close to it," revealing though that might be, does not foreclose the possibility of our finding prejudicial error in the prosecutor's remarks. Defense counsel registered his objection to the comments on three separate occasions, thus adequately preserving the issue for appeal.

Clearly, some of the summation comments are less troubling than others. The prosecutor's description of the route taken by the two men from the Columbia Cafe to the Family Texaco, although improper because it was not based on evidence adduced at trial, did not have the capacity to prejudice defendant. Simply put, what route defendant and Mills followed to the crime scene had no direct bearing on the determination of defendant's guilt.

Moreover, the prosecutor's observation that Mills drove the car and dropped defendant off after the murder are logical inferences that may be drawn based on testimony presented to the jury. Mills obtained the car keys from Renee Burkhardt, drove the car from the Columbia Cafe, and gave the keys back to Burkhardt upon returning to the bar (whereas defendant had yet to come back). Although the prosecutor's statement that Mills dropped defendant off at home is beyond the record, that comment, much like the description of the travel route taken by the two men, had no specific bearing on defendant's guilt or innocence aside from the subtle implication that if Mills was the driver defendant must have been the shooter. Where defendant was dropped off after the murder was of minimal import in the jury's deliberations. Furthermore, the prosecutor's comment regarding the shotgun being discarded in the creek was a fair and logical inference to be drawn based on the record. In addition to the testimony concerning the gun being found in the creek, Wrigley testified that defendant said he threw the gun in a body of water.

Other aspects of the summation, however, present closer questions. The qualitative difference distinguishing those comments from the others discussed above lies in their relation to key issues in the case, whether defendant and not Mills was the shooter and

whether the shooting was intentional or the result of a botched robbery.

Evidence presented to the jury established neither that defendant loaded the gun during the car ride nor cocked the hammer of the weapon en route to the Family Texaco, although the prosecutor couched both assertions as fact. However, in view of the numerous inculpatory statements made by defendant, including his expressed desire to kill to see what it felt like, it obviously can be inferred that defendant loaded the weapon at some point prior to the shooting. Nevertheless, the prosecutor's statement that defendant loaded the weapon during the car ride had no basis in the record and was highly improper. We note that upon defense counsel's objection the prosecutor did concede that "maybe [defendant] doesn't do it during the ride." Secondly, there was no evidence in the record to support the prosecutor's assertion that defendant cocked the hammer of the weapon back during the car ride. Defendant contends that extra-record statement impermissibly suggested that the murder was intentional, when it may have been the product of a botched robbery. However, the crucial question is not when the hammer was cocked but whether the shooting was intentional or not. That this killing was intentional was essentially uncontroverted, in view of the evidence suggesting that Donaghy suffered a "contact" wound, that he had been seated when shot as inferable from the bullet's downward trajectory, and that defendant robbed Donaghy only after shooting him—not to mention defendant's statement to Wrigley that he wanted to feel what it was like to kill someone.

We also conclude that the prosecutor's characterization of Mills as the "getaway driver" and his observation that the murder "take[s] seconds and [defendant is] gone and back in the car with Mills," although approaching the fine line "that separates forceful from impermissible closing argument," *Rose, supra,* 112 *N.J.* at 518, 548 *A.*2d 1058, are fair inferences to be drawn from the record. The jury did receive testimony that the two men left the bar with Mills driving, and that Mills returned to the bar and gave

Renee Burkhardt her car keys. More importantly, we note the testimony that indicated defendant pursued numerous other avenues to "pick up money from [his] boss" at the Columbia Cafe. Defendant asked Shiplee if Sadlowski could use her car to drive defendant, then asked Shiplee if she would drive him, and then inquired whether he could borrow her car to drive himself. Additionally, he asked Zuzulock if she could get her car so he could collect his money. A fair and logical inference to be drawn from the foregoing was that defendant cared little about who drove him, or if he simply drove himself—thus supporting the conclusion that whoever drove defendant was destined to play a relatively insignificant role in the crime in comparison to that of defendant.

■■■ However, the prosecutor's assertions that defendant approached the victim from "the blind side" and that he "shoulder[ed] in the door like this" were entirely inappropriate. The State's submission of the generalized need for the "element of surprise" as supporting this comment is simply inadequate. Equally unavailing is the State's argument that because Georgetown Road runs on the "blind side" (the garage side) of the Family Texaco, an inference that defendant approached in this manner was supportable. That argument ignores the fact that no evidence adduced at trial indicated what route the men had taken to the gas station in the first place.

■■■ Nevertheless, as inappropriate as they were, we are not persuaded that in the context of the entire trial the prosecutor's comments had the capacity to deprive defendant of a fair trial. The direction from which defendant approached and the way in which he entered the door did not establish whether this was an intentional murder. As noted above, that fact was demonstrated forcefully by the evidence presented at trial. Concededly, the prosecutor's assertion that it was defendant who entered the office and shot Donaghy went directly to the crucial own-conduct determination. However, the evidence detailed at length above overwhelmingly indicated that defendant, and not Mills, was the shooter. We are fully satisfied that it was the weight of the

evidence, particularly the damning statements uttered by defendant himself, that led to this capital murder conviction rather than the prosecutor's improper comments during summation.

We also recognize that the prosecutor's summation is best reviewed within the context of the trial as a whole. *Ramseur*, *supra*, 106 *N.J.* at 323, 524 *A.*2d 188. Of particular relevance is the line of argument defense counsel pursued in summation, which portrayed Mills as the principal offender:

> The [S]tate made a better case against Michael Mills than they have against [defendant]. It couldn't be more clear. Who borrowed the car? Michael Mills. Who stopped on the [W]hite [B]ridge? Although we are not privy to the conversations that occurred, the shotgun is pulled from the water. Who? Michael Mills. Who moved the bag out of Shiplee's car? Michael Mills.
>
> . . . .
>
> Who committed suicide? The prosecutor introduced to you in his opening statement, Michael Mills isn't here because he committed suicide.

Although the court did instruct the jury not to draw any inferences from the fact of Mills's suicide, a fair reading of the closing arguments indicates that the prosecutor's comments were a response to the defense portrayal of Mills as principal, and were designed to advance the State's theory that defendant was the shooter. Therefore, at least with regard to the own-conduct determination, the issue was "contested to an extent sufficient to minimize the impact of the prosecutor's infraction." *Wilson*, *supra*, 128 *N.J.* at 243, 607 *A.*2d 1289 (quoting *Marshall I, supra*, 123 *N.J.* at 157, 586 *A.*2d 85).

Moreover, despite the improper nature of certain aspects of the summation, the unambiguous instruction provided by the court at the end of the guilt phase reassures us that the prosecutor's closing comments did not deprive this defendant of a fair trial:

> Regardless of what counsel may have said in their arguments to you, their discussions with you, as to what they recall about the evidence in the case, it is your recollection of the evidence that must guide you as judges of the facts.
>
> So, if there was something that they said, and I'm sure it would have been in good faith, but if there was something they said about how they recall the evidence to be, what they said a witness said, if that is different than the way you recall it, you must rely upon your own recollection in determining what the evidence is and what the facts are.

> Arguments, statements, remarks, openings and summations of counsel are not
> evidence in the case and may not be treated as evidence. Although the attorneys
> may point out to you properly what they think important in the case, you must rely
> solely upon your understanding and your recollection of the evidence that was
> admitted during the trial.

We will presume that the jury adhered to the court's instruction. *State v. Muhammad,* 145 *N.J.* 23, 52, 678 *A.*2d 164 (1996); *State v. Manley,* 54 *N.J.* 259, 270, 255 *A.*2d 193 (1969).

In the interest of completeness, we also briefly address and reject defendant's challenge to the manner in which the trial court dealt with the objections to the State's summation. We reject the contention that the trial court improperly endorsed the State's position in front of the jury. In this hard-fought trial, both sides received favorable and unfavorable rulings on objections. Furthermore, we find no evidence in the record to suggest that defendant was prejudiced by, or even that the jury witnessed, an angry tone on the part of the trial court in dealing with defense counsel at sidebar. As defense counsel conceded on the occasion he aired concerns with the court's demeanor, "I want the record to be clear, I think the defendant got, regardless, an incredibly fair, clean, and evenhanded judge throughout."

## B. Jury Information on Michael Mills's Suicide

Defendant argues that the repeated mention of Michael Mills's suicide denied him a fair trial. As noted, Mills killed himself on June 18, 1994. Before trial began, defendant moved to preclude the State from telling the jury that Mills had committed suicide, as opposed to informing the jury simply that he had died. The prosecutor's position was that the information was necessary to provide context, so that the jury would not be "shocked" if the truth was revealed later. Asked to identify the prejudice defendant would suffer if the jury was told of Mills's suicide, defense counsel balked:

> I think that if it is irrelevant, prejudice is not significant. If the Court is asking for
> prejudice, there is practically none if all they offer is that he committed suicide,
> period. But if anyone then wishes to go into the facts surrounding the suicide, it

sounds to me like a back door attempt to put in statements [Mills] made about my client, which they can't do.

Because defense counsel elected not to pursue the matter further, the court never explicitly ruled on the issue. During the State's opening argument, the prosecutor noted that "[y]ou're not going to hear from Michael Mills. Michael Mills is not going to testify because in June of [19]94 Michael Mills committed suicide."

Similarly, the State's redirect of Daniel Kaighn placed Mills's suicide before the jury:

Q: And then there was a question about whether you had spoken to Mr. Mills or—by the way, Mr. Mills is no longer with us, is that correct?
A: Yes.
Q: And what happened to him?
A: He was found hanged on his front porch.
Q: Suicide?
A: So they say.

Kevin Wrigley also testified to Mills's suicide during the State's direct examination:

Q: Did he give you any names of anybody else who had been involved in that?
A: Yeah, this guy Mike.
Q: And did he tell you anything about—
A: He says he was a witness and his dad had him taken care of. He thought that he committed suicide or something like that.
Q: This is what Mr. Feaster's saying?
A: Yeah.
Q: And that's in relation to a guy named Mike?
A: Yeah.

Defense counsel did not object to the prosecutor's opening comment or the testimony provided by Kaighn and Wrigley, nor did defense counsel request a limiting instruction. In fact, defense counsel emphasized Mills's suicide during summation to further its argument that Mills rather than defendant was the shooter:

The [S]tate made a better case against Michael Mills than they have against [defendant]. It couldn't be more clear. Who borrowed the car? Michael Mills. Who stopped on the [W]hite [B]ridge? Although we are not privy to the conversations that occurred, the shotgun is pulled from the water. Who? Michael Mills. Who moved the bag out of Shiplee's car? Michael Mills.

. . . .

Who committed suicide? The prosecutor introduced to you in his opening statement, Michael Mills isn't here because he committed suicide.

The prosecutor objected to the insinuation that Mills's suicide reflected his consciousness of guilt. The court then provided a limiting instruction, over defendant's objection, that the jury should "not draw any inferences as to Mr. Mills'[s] suicide or the reasons that may have existed for him to have committed suicide." After the death sentence, defendant's motion for a new trial was based partially on the information heard by the jury relating to Mills's suicide. Finding that the information was necessary to adequately inform the jury, the court rejected the argument.

Defendant first argues that Mills's suicide was irrelevant. Defendant also submits that testimony concerning Mills's suicide prejudiced him by unfairly raising the specter of defendant's consciousness of guilt, suggesting that because the jury may have believed the suicide reflected Mills's consciousness of guilt, that consciousness was "transferred" to defendant "by association." Next, defendant claims that the information improperly allowed the jury to infer that Mills's suicide resulted from his fear of defendant, thereby prejudicing the jury against defendant. In support of that contention, defendant points to Kaighn's response of "[s]o they say" when asked whether Mills's death was due to suicide, and Wrigley's characterization of defendant's statement that his father "had [Mills] taken care of." Lastly, defendant submits that even if the information was relevant, its probative value was outweighed by the risk of undue prejudice under *N.J.R.E.* 403.

■ We find Mills's suicide to be relevant information properly presented to the jury. In *State v. Mann*, 132 *N.J.* 410, 421–23, 625 *A.*2d 1102 (1993), we observed that a defendant's attempted suicide is generally admitted into evidence. *See, e.g., Aldridge v. State*, 229 *Ga.App.* 544, 494 *S.E.*2d 368, 370–71 (1997); *State v. Mitchell*, 450 *N.W.*2d 828, 831–32 (Iowa 1990). We stated that before admitting such evidence, a trial court should normally hold an admissibility hearing to determine whether evidence of the

attempt is "sufficient to support a reasonable inference that the suicide attempt was prompted by a desire to avoid prosecution and punishment or was otherwise evidence of consciousness of guilt." *Mann, supra,* 132 *N.J.* at 423, 625 *A.*2d 1102. We noted that a court also should consider alternative explanations offered by the defendant, any possible prejudice that might attend such evidence, and in the event of the admission of the evidence, should provide an instruction on its proper use. *Id.* at 424, 625 *A.*2d 1102.

Unlike *Mann,* this case implicates the suicide of an alleged accomplice and not a defendant's attempt at suicide. The State notes that Mills was not being charged with any crime at the time of his death. Nevertheless, we are satisfied that *Mann* 's conclusion that a defendant's attempted suicide may be relevant in some circumstances is applicable in this context. *See Commonwealth v. Gibson,* 547 *Pa.* 71, 688 *A.*2d 1152, 1166 n. 30 (1997)(validating prosecutor's mention of co-defendant's suicide, because evidence establishing that suicide had been presented), *cert. denied,* —— *U.S.* ——, 118 *S.Ct.* 364, 139 *L. Ed.*2d 284 (1997).

The relevance of Mills's suicide is best understood in the context of Wrigley's testimony. The credibility of Wrigley's testimony was under severe attack by the defense. The State convincingly demonstrated the value of his testimony by providing Wrigley's detailed account of defendant's statements, including the mention of a suicide by an accomplice named "Mike." The idiosyncratic nature of Wrigley's knowledge directly buttressed his credibility and, necessarily, the State's case against defendant. See *N.J.R.E.* 401 (defining relevant evidence as that "having a tendency in reason to prove or disprove any fact of consequence to the determination of the action"). Similarly, the prosecutor's opening comment provided context for what would come later, and Kaighn's testimony provided direct evidence of Mills's suicide.

■ Having determined that evidence of Mills's suicide was relevant, we also conclude that the information did not unduly prejudice defendant. Under *N.J.R.E.* 403, relevant evidence may be excluded in the trial court's discretion if its probative value is

substantially outweighed by the risk of undue prejudice. Defendant argues that the suicide, because it may have indicated Mills's guilty conscience, unfairly tarnished defendant in view of the likelihood that the jury would transfer that consciousness of guilt to him. We recognize the plausibility of that inference. However, an equally plausible inference to be drawn from Mills's suicide is that Mills's role in the murder was more significant than the State suggested, thereby lessening the culpability of defendant. Thus, two inferences, one prejudicial to defendant and the other beneficial, could have been drawn from the evidence of Mills's suicide. In view of the substantial evidence presented at trial linking defendant to the crime, we perceive that any prejudice occasioned by the negative inference was minimal. Therefore, taking into account the obvious relevance of the testimony concerning Mills's suicide, we are unable to conclude that the probative value of that evidence substantially was outweighed by the risk of undue prejudice. We also note the court's clear instruction at the end of the guilt phase admonishing the jury not to draw any inferences from the evidence of Mills's suicide.

Nor are we persuaded that the manner in which the information was presented unduly prejudiced defendant. Kaighn stated "[s]o they say" in response to the prosecutor's inquiry of whether Mills committed suicide. Although that statement may be perceived as indicating Kaighn's belief that Mills's death was not actually a suicide, the reference was fleeting. Moreover, the prejudicial effect of the statement was minimized in view of the prosecutor's acknowledgment that the death was a suicide. Similarly, Wrigley's testimony that defendant's father had "taken care of Mills" was an isolated reference that the prosecutor declined to explore. Defense counsel did not object to any of those statements. Moreover, in view of the testimony's relevance, we are convinced that any foreseeable prejudice to defendant could not have outweighed its probative value.

Recognizing that defense counsel attempted to capitalize on Mills's suicide during summation supports our conclusion. As

noted, the reality is that Mills's suicide, with its attendant suggestion of Mills's consciousness of guilt, inured to defendant's benefit as it raised at least a permissible inference that Mills, not defendant, may have killed Donaghy. Defense counsel's summation clearly encouraged the jury to draw that inference, which the trial court discouraged by directing the jury to draw no inferences from Mills's suicide.

### C. Felony–Murder Nonunanimity Option

Defendant asserts that the jury should have been instructed that it could find defendant guilty of murder without having to be unanimous on the particular form of murder, namely, purposeful-or-knowing murder or felony murder. Defendant points out that a rational basis existed for finding that defendant was guilty of felony murder resulting from a robbery gone awry. We rejected that same argument in *Cooper, supra*, 151 *N.J.* at 361–63, 700 *A.*2d 306, and decline defendant's invitation to overrule that aspect of our *Cooper* decision.

### D. Sequential Presentation of Purposeful–or–Knowing Murder and Felony Murder

Similarly, defendant argues that the trial court erred in charging the jury that it should consider felony murder only after it acquitted or convicted defendant of purposeful-or-knowing murder. We rejected that claim in *Cooper* and adhere to the reasoning in that decision. *Id.* at 363–70, 700 *A.*2d 306.

### E. Jury Knowledge of Sentence for Felony Murder

The trial court failed to *sua sponte* instruct the jury that a felony murder conviction carried with it a minimum sentence of thirty years' imprisonment. Defendant raises the omission as plain error and contends that the jury was not aware of the full effect of its determination. In *Cooper* we rejected an analogous claim, *id.* at 370–78, 700 *A.*2d 306, and decline to revisit that ruling.

## F. Failure to Provide *Hampton* and *Kociolek* Charges

During its instructions to the jury at the end of the guilt phase, the trial court did not provide and defendant did not request the charges required by *State v. Hampton*, 61 *N.J.* 250, 294 *A.*2d 23 (1972), and *State v. Kociolek*, 23 *N.J.* 400, 129 *A.*2d 417 (1957), regarding the credibility of defendant's oral statements. Specifically, defendant points out that the incriminating statements allegedly made by defendant to Kaighn, Shiplee, Sadlowski and Wrigley were a vital link in the State's case, without which any conviction would have been unlikely. In view of the inconsistencies in some of those statements, and the witnesses' attempts to curry favor with the State or obtain reward money, along with Sadlowski's and Shiplee's admissions of having ingested drugs or alcohol on the night of the murder, defendant argues that those instructions were necessary to focus the jury's attention on the unreliability of the statements.

Defendant first urges that in capital cases the failure to provide *Hampton* and *Kociolek* instructions is *per se* reversible error. We rejected an analogous contention in *State v. Jordan*, 147 *N.J.* 409, 425–28, 688 *A.*2d 97 (1997). In view of defendant's failure to object to the instructions at trial, we consider the court's failure to provide those instructions *sua sponte* under a plain error standard, that is, whether their omission was clearly capable of producing an unjust result. *R.* 2:10–2.

*Hampton* dealt with a defendant's statements to police in a custodial setting. 61 *N.J.* at 272, 294 *A.*2d 23. *N.J.R.E.* 104(c) is the embodiment of the *Hampton* rule, and provides:

> *Where by virtue of any rule of law a judge is required in a criminal action to make a preliminary determination as to the admissibility of a statement by the defendant,* the judge shall hear and determine the question of its admissibility out of the presence of the jury. In such a hearing the rules of evidence shall apply and the burden of persuasion as to the admissibility of the statement is on the prosecution. *If the judge admits the statement the jury shall not be informed of the finding that the statement is admissible but shall be instructed to disregard the statement if it finds that it is not credible.* If the judge subsequently determines from all of the evidence that the statement is not admissible, the judge shall take appropriate action.

72

[Emphasis added.]

Thus, *N.J.R.E.* 104(c) by its terms limits its application to instances when the defendant has challenged the admissibility of the statements. As a preliminary matter, we find that *Hampton* does not apply to the bulk of the incriminating statements allegedly made by defendant; only the admissibility of Wrigley's testimony was challenged.

██ We conclude that the failure of the trial court to provide a *Hampton* charge regarding Wrigley's testimony was not plain error clearly capable of producing an unjust result. The very purpose of a *Hampton* charge is to call the jury's attention to the possible unreliability of the alleged statements made by a criminal defendant. Here, on cross-examination, Wrigley came under a sustained attack during which his credibility was thoroughly challenged. Furthermore, the court provided a detailed credibility instruction that sufficiently guided the jury in assessing Wrigley's testimony. Although a *Hampton* charge was not given, the jury was made well aware of the questions surrounding the reliability of defendant's alleged statements to Wrigley. We find no plain error in the court's failure to provide a *Hampton* charge *sua sponte.*

Unlike *Hampton,* a *Kociolek* charge involves the general reliability of a defendant's statements. In *Kociolek, supra,* 23 *N.J.* at 421, 129 *A.*2d 417, we held that when a defendant's oral statements have been introduced against him, the trial court must instruct the jury that it should consider such evidence with caution "in view of the generally recognized risk of inaccuracy and error in communication and recollection of verbal utterances and misconstruction by the hearer." *Kociolek* applies in this case to the testimony of Sadlowski, Shiplee, Kaighn and Wrigley regarding inculpatory statements made by defendant. Indeed, the incriminating statements made by defendant to those witnesses was at the heart of the State's case against defendant.

██ Under those circumstances, a *Kociolek* charge should have been given. Nevertheless, we must determine whether the

omission of such an instruction constituted plain error clearly capable of producing an unjust result. Defendant's case rested largely on his attack on the credibility of the State witnesses, characterized by specific impeachment of the witnesses' recollection of the incriminating statements made by defendant. Defense counsel explored at length the criminal records of certain witnesses, their attempts to curry favor with the State and their motivation to lie, and the reliability of their perception after ingesting drugs or alcohol. Additionally, the court provided the jury with a detailed credibility charge, including instructions on inconsistent statements, substance abuse, and motivation to lie. We are fully satisfied that in light of the testimony, arguments and instructions, the critical issue of the reliability of defendant's incriminating statements was thoroughly and sufficiently placed before the jury. Therefore, we find no plain error in the omission of *Hampton* and *Kociolek* charges.

G. Testimony that Defendant Invoked *Miranda* Rights

At trial, Investigator Alvarado of the Gloucester County Prosecutor's Office described an interview with defendant conducted after his November 4, 1993 arrest. During that interview, defendant indicated that Jim McCall was his employer. As noted above, Jim McCall testified for the State and stated that defendant worked for him on only one occasion, which was after the murder, and that he had paid defendant for his services. That testimony buttressed the State's theory that defendant's frequent comments that he needed to go to "his boss to get the money he owed him" was really defendant's shorthand way of indicating that he planned to rob a gas station. Defendant's interview with Alvarado ended when defendant invoked his right to counsel, after having been confronted with incriminating statements that investigators had gathered.

The State indicated that it intended to call Alvarado to testify that defendant told him McCall was his employer. The prosecutor stated that as part of his testimony Alvarado would testify that

defendant was read his *Miranda* rights, that he waived those rights but qualified his waiver by saying that he would not answer any questions relating to the murders, that defendant answered several preliminary questions, including the question regarding his employment, and that defendant subsequently terminated the interview by invoking his right to counsel. The prosecutor asserted that mentioning defendant's invocation of his right to counsel was necessary to show that there was a logical end to the interview: "Otherwise, the jury thinks, well, you know, why does it end there?"

The court conducted a hearing pursuant to *N.J.R.E.* 104, and relying on *State v. Carroll,* 256 *N.J.Super.* 575, 607 *A.*2d 1003 (App.Div.), *certif. denied,* 130 *N.J.* 18, 611 *A.*2d 656 (1992), and *State v. Ruscingno,* 217 *N.J.Super.* 467, 526 *A.*2d 251 (App.Div.), *certif. denied,* 108 *N.J.* 210, 528 *A.*2d 30 (1987), allowed the reference to defendant's invocation of his right to counsel, subject to the condition that the witness connect that event with the termination of the interview. Defense counsel objected, arguing that the reference invited the jury to infer consciousness of guilt, and that it added nothing to the proffered testimony that defendant "declined to answer any further questions." Alvarado took the stand and testified consistently with the State's description of his testimony. Defendant's invocation of his right to counsel was elicited during the following colloquy:

Q: Did you, during that time, did you confront [defendant] with the facts that you had gathered during your investigation up to that point?

A: Yes, sir, I did.

Q: And what did [defendant] say?

A: He invoked his right to counsel. ·

Q: And so, as a result, what did you do?

A: I ended the interview.

At that time, defendant did not request and the court did not provide a cautionary instruction with regard to the testimony. However, the prosecutor did not venture any comment concerning that testimony during summation, and the court's charge informed

the jury that defendant's failure to testify could not be used against him.

Defendant asserts that Alvarado's testimony impermissibly caused the jury to draw a negative inference from his invocation of his constitutional right. Further, defendant contends that there was no need to show that the interview had a logical ending, because defendant had not provided any statement relating to the investigation—he merely offered background personal information. Defendant stresses that he agreed only to answer personal questions and not interrogatories relating to the murders. Defendant submits that the statement regarding his employer could have been introduced without revealing his invocation of his right to counsel, and that the court compounded the error by failing to provide an immediate cautionary instruction.

*State v. Ruscingno, supra,* 217 *N.J.Super.* at 470–71, 526 *A.*2d 251, involved an officer's testimony that a defendant waived his *Miranda* rights, offered a statement that the defendant believed exculpated him, but then invoked his right to remain silent when confronted by the officer with incriminating evidence. Upholding the admission of the testimony, the Appellate Division observed that "this testimony was not elicited to draw unfavorable inference to the fact that defendant decided to remain quiet at that point; rather, the testimony shows that the interrogation had a logical ending." *Id.* at 471, 526 *A.*2d 251; *see also State v. Carroll, supra,* 256 *N.J.Super.* at 601–02, 607 *A.*2d 1003 (citing *Ruscingno* and concluding that testimony regarding defendant's invocation of right to counsel "was not used against him").

In our view, trial courts should endeavor to excise any reference to a criminal defendant's invocation of his right to counsel. "Such statements can be excised without making the narrative stilted, with the effect of avoiding prejudice to or unfair inference against either party." *United States v. Williams,* 556 *F.*2d 65, 67 (D.C.Cir.), *cert. denied,* 431 *U.S.* 972, 97 *S.Ct.* 2936, 53 *L. Ed.*2d 1070 (1977). Particularly in this context, where the purpose of the testimony is to report evidence unrelated to the underlying crime

itself, we do not believe a jury will be left to speculate about what later transpired if it is not provided an explanation of why the interview ended.

■ However, in cases where the proffered testimony does relate substantial evidence regarding a defendant's statements about the underlying crime, such that a jury without further information would be naturally inclined to question why testimony regarding subsequent events was not offered, a trial court may in its discretion permit testimony explaining why an interview or interrogation was terminated. Such discretion properly would be exercised only if the testimony is essential to the complete presentation of the witness's testimony and its omission would be likely to mislead or confuse the jury. In those instances, a cautionary instruction should be provided that explains to the jury that people decline to speak with police for many reasons, emphasizing that a defendant's invocation of his right to counsel or right to remain silent may not in any way be used to infer guilt. We believe that approach strikes an appropriate balance by eliminating possible jury confusion and, at the same time, guarding against any impermissible inferences that could undermine a defendant's fundamental right to a fair trial.

The record before us indicates that defendant waived his *Miranda* rights but stated that he would not speak about the murders. Although the State now asserts that defendant never qualified his waiver, that issue does not need to be addressed to resolve defendant's claim. The purpose of Detective Alvarado's testimony was to relate defendant's statements concerning his employment. Because his testimony did not purport to convey any information relevant to defendant's involvement in the murders, the jury would not have been likely to speculate without an explanation of why the interview ended. Further, the court should have provided a cautionary instruction to prevent the jury from drawing any unfavorable inferences against defendant's invocation of his right to counsel.

 Nonetheless, we conclude that the trial court's actions did not amount to reversible error. First, we note the fleeting nature of the reference to defendant's invocation of his right to counsel. Additionally, the prosecutor did not comment on the matter during summation. Moreover, the court provided an emphatic instruction to the jury that it not in any way hold defendant's failure to testify against him. Although that instruction did not relate directly to defendant's invocation of his right to counsel, it did impart to the jury the respect to be accorded defendant's decision to remain silent. The convergence of those factors, in addition to defendant's failure to request a cautionary instruction, persuades us that this jury was unlikely to have drawn any unfavorable inferences against defendant that jeopardized his fundamental right to a fair trial.

### H. Issues Concerning Kevin Wrigley

The State presented the testimony of Kevin Wrigley, who alleged that he shared a jail cell with defendant for one night, during which time defendant made several inculpatory remarks. At trial, Wrigley at first could not identify defendant. Wrigley explained that it was dark in the cell, that he spent only one night there with defendant, and that he was lying down most of the time. Wrigley asserted that defendant was talking with an inmate named James, who was the third person sharing the cell. Wrigley noted that defendant told him his name was Richard Feaster and that he was roughly the same height as Wrigley.

Defense counsel requested a sidebar and objected to the admission of Wrigley's testimony, arguing that no substantial reason existed to believe Wrigley was in the same cell as defendant. Outside the presence of the jury, the court conducted an *N.J.R.E.* 104 hearing. Wrigley indicated the person in the cell had a tattoo on his arm that said "Rich," and described him as a Caucasian with short hair. Wrigley recalled that defendant said his father worked in construction, and that his bail had been raised from one million to two million dollars. He went on to recall the inculpatory

statements defendant had made, including his assertions that he "blew some guy's head off," that he "got a couple hundred dollars," and that he "wanted to see what it felt like to kill somebody." According to Wrigley, he also recalled that defendant told James, another inmate in the cell who was being released from the holding cell to return to the general prison population, that he should tell Mike "Shalowski or something like that" that defendant was there. On cross-examination, Wrigley admitted that "I really don't remember what [defendant] looks like."

The judge then excused Wrigley from the stand before entertaining argument on the matter. On his way out of the courtroom, Wrigley stated to the prosecutor that "I think that's him. I think that's him sitting there," referring to defendant. The court called Wrigley back to the stand, and Wrigley explained that he previously could not see defendant seated at the end of the defense table from his vantage point in the witness stand.

In allowing Wrigley to testify, the court observed that, based on its experience in that courtroom, testifying witnesses who are not positioned at the forefront of the witness stand do not have a complete view of the courtroom. The court also noted that Wrigley gave "very specific information" that was "consistent with information about [defendant's] circumstances," and concluded that it was "satisfied that there's sufficient indicia of reliability to allow this witness to testify." The jury returned and Wrigley delivered his damaging testimony against defendant.

Defense counsel conducted a rigorous cross-examination, during which Wrigley's initial inability to identify defendant and the dark condition of the jail cell were highlighted. During the presentation of defendant's case, the deputy warden of the Gloucester County jail testified that, according to jail records, Wrigley had been in a holding cell on three separate dates, but no record existed indicating that defendant had ever been in a holding cell. However, both the State and defendant did stipulate that defendant was in a holding cell on November 8 and 9, 1995. According

to the jail records, Wrigley had not been in holding cells on those dates.

Defendant asserts that Wrigley did not provide a sufficient foundation under *N.J.R.E.* 602 for his assertion of personal knowledge regarding the subject of his testimony. Defendant contends that the jail records and the possibility that Wrigley learned the facts of the case from newspaper accounts rendered the testimony too unreliable to be admissible. Because Wrigley's testimony that defendant "wanted to see what it felt like" to kill went directly to the finding of defendant's intent to kill, defendant argues that his purposeful-or-knowing murder conviction must be reversed. Defendant also maintains that his death sentence must be reversed in any event, because the "thrill-kill" aspect of Wrigley's testimony poisoned the penalty phase.

■ We find that a reasonable jury could conclude that a conversation between defendant and Wrigley occurred, and that the court's admission of Wrigley's testimony was therefore appropriate. *N.J.R.E.* 602 provides:

> Except as otherwise provided by Rule 703 (bases of opinion testimony by experts), a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself.

Here, any perceived inadequacies in Wrigley's testimony concern the weight it was to be accorded by the jury, not its admissibility. Wrigley described defendant's physical appearance, including defendant's "Rich" tattoo, and recounted what defendant told him about the murder—which corroborated the accounts rendered by other testifying witnesses, namely Shiplee and Sadlowski. Also, after some initial difficulty, Wrigley was able to identify defendant in court as the individual with whom he had shared the jail cell. Clearly, a reasonable jury could have concluded that Wrigley's account was true.

The question concerning the jail records does not change our conclusion. As the State demonstrated, those records did not indicate that defendant was ever in the jail, although both parties

stipulated that defendant was in fact there. A reasonable basis therefore existed for the jury to find that the jail records were simply inaccurate as they related to defendant.

Indeed, there were vulnerable areas of Wrigley's testimony, and defense counsel properly highlighted those problems for the jury. We are satisfied that the State provided an adequate foundation to support the admissibility of Wrigley's testimony and that the trial court's ruling admitting Wrigley's testimony did not constitute an abuse of discretion.

Defendant also asserts that the trial court improperly endorsed Wrigley's testimony. As noted above, Wrigley initially failed to identify defendant. However, on his way out of the courtroom, he remarked that he did recognize defendant sitting at the defense table. Wrigley explained that he did not have a full view from the witness stand due to an obstruction. The trial court agreed, observing that the view was obstructed unless a witness was sitting at the very front of the witness box.

When the jury returned, the prosecutor resumed direct examination. After the court instructed Wrigley to roll his witness chair forward and lean forward, the prosecutor again attempted to have him identify defendant:

Q: Now, take a good look around [for] this person who identified himself as Richard Feaster, do you see him in court?

A: Yeah.

Q: Okay. Where is he?

A: (Witness indicates.)

Q: Now—

The Court: You're pointing. I want to be able to say for the record who you're pointing to. The individual to your extreme left, sitting down at the table?

A: Yes.

The Court: Go ahead. That is the defendant.

By [the State]:

Q: And prior to the jury being taken out, could you see him in the courtroom?

A: No.

Q: Because of what?

A: Cause of this, sitting back.

The Court: *This being the side of the bench where I'm sitting, which is an obstruction if you're sitting too far back. Go ahead.*
[Emphasis added.]

Defense counsel did not object to the court's statement that the bench could obstruct a witness's view of the defense table.

■ Defendant argues that the court's statement served as an improper endorsement of the credibility of Wrigley's testimony, "foreclos[ing] the possibility of fruitful cross-examination on this issue." Because it is exclusively within the province of the jury to find fact and evaluate witness credibility, a trial court may not vouch for the credibility of a witness. *See, e.g., State v. Walker,* 33 *N.J.* 580, 595, 166 *A.*2d 567 (1960)(finding improper court's statement in front of jury that "[s]he knows she is on the stand, she is under oath and when witnesses are on the stand they are all under oath and they all tell the truth")(emphasis deleted); *State v. Zwillman,* 112 *N.J.Super.* 6, 20–21, 270 *A.*2d 284 (App.Div.1970) (noting that trial judge "must not throw his judicial weight on one side or the other"), *certif. denied,* 57 *N.J.* 603, 274 *A.*2d 56 (1971).

■ We are unpersuaded that the court's brief reference to the jury that the bench was "an obstruction if you're sitting too far back" constituted an impermissible endorsement of Wrigley's testimony. When asked why Wrigley could not identify defendant earlier, he offered that it was "[be]cause of this, sitting back." The court then explained to the jury that "this" referred to the court's bench, which is an obstruction in that particular courtroom if a witness is sitting too far back. The court's observation was a statement of fact, not an opinion about whether Wrigley actually was sitting too far back or whether his view actually was obstructed. We perceive no error in the court's factual clarification.

I. Admission of Blood–Stained Overalls and Use of Mannequin with Knitting Needle Through Its Head

Defendant contends that he was denied a fair trial when the court admitted Donaghy's blood-stained overalls into evidence, and when it permitted the medical examiner to demonstrate the path

of the bullet by inserting a knitting needle through the head of a mannequin. Defendant asserts that the evidence not only was highly inflammatory but cumulative as well, in view of the admission of numerous autopsy and crime-scene photographs and a videotape of the crime scene.

The court overruled defendant's objection and allowed the jury to view the overalls, and rejected defendant's renewed objection to the admission of the overalls into evidence. Defendant also made timely objection to the use of the mannequin. Initially, the State had proposed using a life-sized mannequin dressed in the victim's overalls and wearing a wig to aid the medical examiner in his description of the fatal wound, but the court disallowed it: "[D]ressing up the mannequin and putting it in the courtroom is kind of like simulating this is Mr. Donaghy and here he is dead on the floor in front of you and that is inflammatory." The court allowed the use of the mannequin but without the wig or overalls. The court also refused to admit the mannequin into evidence and precluded the prosecutor from using it during summation. Moreover, the mannequin was clothed in a hospital gown and was before the jury for only two to three minutes. The court stated for the record that none of the jurors exhibited any signs of emotional distress during the presentation.

 Considerable latitude is afforded a trial court in determining whether to admit evidence, and that determination will be reversed only if it constitutes an abuse of discretion. See *State v. McDougald*, 120 *N.J.* 523, 577–78, 577 *A.*2d 419 (1990); *see also Koedatich I, supra,* 112 *N.J.* at 313, 548 *A.*2d 939 (explaining evidentiary ruling will be disturbed if there has been "clear error in judgment"); *State v. Carter,* 91 *N.J.* 86, 106, 449 *A.*2d 1280 (1982)(noting trial court's ruling will stand unless "its finding was so wide of the mark that a manifest denial of justice resulted"). The State may also use demonstrative aids even if those aids are somewhat cumulative to other evidence it has previously presented. See *State v. Grunow,* 199 *N.J.Super.* 241, 253, 488 *A.*2d 1098 (App.Div.1985), *aff'd,* 102 *N.J.* 133, 506 *A.*2d 708 (1986).

Whether evidence is admissible turns on its relevance and whether its probative value is substantially outweighed by undue prejudice. *N.J.R.E.* 403; *Carter, supra,* 91 *N.J.* at 106, 449 *A.*2d 1280. Here, both the overalls and the mannequin were relevant to the State's case and carried significant probative value. The State's theory of the case was that defendant shot Donaghy and only then took money from him. That theory was buttressed by the position in which Donaghy was found, with only one of the overalls' pockets exposed and money missing from only that pocket, although other pockets contained additional money. The overalls assisted the jury by enabling them to see the positioning of the various pockets on the overalls. The knitting needle indicating the trajectory of the bullet also supported the State's theory that Donaghy was sitting down when he was shot. That fact lent support to the State's theory of intentional rather than accidental shooting. Although defendant asserts that no testimony supported the contention that Donaghy was seated, the medical examiner's testimony indicating that the bullet followed a downward trajectory itself supported that conclusion. We note that other courts have upheld the admission of similar evidence. *See, e.g., People v. Medina,* 11 *Cal.*4th 694, 47 *Cal.Rptr.*2d 165, 906 *P.*2d 2, 36 (1995)(holding use of mannequin and wooden probe to show trajectory relevant to show intent in capital prosecution), *cert. denied,* —— *U.S.* ——, 117 *S.Ct.* 151, 136 *L. Ed.*2d 96 (1996); *People v. Cummings,* 4 *Cal.*4th 1233, 18 *Cal.Rptr.*2d 796, 850 *P.*2d 1, 38 (1993)(approving use of mannequins as illustrative evidence "to assist the jury in understanding the testimony of witnesses or to clarify the circumstances of a crime"), *cert. denied,* 511 *U.S.* 1046, 114 *S.Ct.* 1576, 128 *L. Ed.*2d 219 (1994); *State v. Holmes,* 609 *S.W.*2d 132, 135–36 (Mo.1980)(finding no abuse of discretion to admit papier-mache mannequin with sixty-four holes indicating stab wounds); *Mackall v. Commonwealth,* 236 *Va.* 240, 372 *S.E.*2d 759, 768 (1988)(holding no abuse of discretion where Styrofoam head with knitting needle inserted to demonstrate bullet's trajectory was admitted in capital prosecution), *cert. denied,* 492 *U.S.* 925, 109 *S.Ct.* 3261, 106 *L. Ed.*2d 607 (1989).

Undoubtedly, this evidence was potentially inflammatory and cumulative to the photos and videotape already presented to the jury. Nevertheless, their proffer was unlikely to have disturbed the jury more than the photos and video, which actually showed the corpse in a pool of blood. The court noted that the overalls "are not gruesome in looking at them. The staining is there, it's clear to see, but it's not gruesome. It's against a dark blue background." Further, we note that the court exercised caution by prohibiting the mannequin from being dressed in the overalls and a wig, refusing to allow the prosecutor to use it during summation, and declining the State's effort to admit the mannequin into evidence.

In the context of the entire record, we are not persuaded that the admission of the overalls into evidence or permitting the jury to observe the mannequin penetrated by the knitting needle constituted an abuse of the trial court's discretion.

J. Cumulative Error

Defendant argues that the aggregate effect of the sequential charge and allegedly inconsistent unanimity instructions, combined with the other claims of error, deprived him of the opportunity to be convicted of a non-death-eligible form of murder, namely, accomplice-liability murder or felony murder.

We have acknowledged before and continue to recognize again today that some measure of imperfection characterizes almost every trial, even capital cases. *Marshall I, supra,* 123 *N.J.* at 169, 586 *A.*2d 85. Even though our concerns and responsibilities are markedly heightened in the context of a death-penalty appeal, *see Bey I, supra,* 112 *N.J.* at 95, 548 *A.*2d 846, we still adhere to the general principle that " '[a] defendant is entitled to a fair trial but not a perfect one.' " *Marshall I, supra,* 123 *N.J.* at 170, 586 *A.*2d 85 (quoting *Lutwak v. United States,* 344 *U.S.* 604, 619, 73 *S.Ct.* 481, 490, 97 *L. Ed.* 593, 605 (1953)). Whether errors occurring in the course of a capital proceeding mandate reversal of either the verdict or the sentence requires "a qualitative determi-

nation that considers, in the context of the entire case, whether the error was clearly capable of affecting either the verdict or the sentence." *Bey I, supra,* 112 *N.J.* at 94–95, 548 *A.*2d 846.

We have carefully reviewed each of the errors defendant raises. We are fully satisfied that, both individually and collectively, any errors committed at trial were not clearly capable of affecting either the verdict or the sentence.

## V

### Penalty–Phase Issues

#### A. Prosecutor's Characterization of Mitigating Evidence

During the State's penalty-phase opening and closing, the prosecutor stressed to the jury that defendant be required to accept "personal responsibility" for his acts. The prosecutor urged the jurors to view defendant's mitigating evidence skeptically:

> Use your common sense. Ask yourselves what they present, is that based on a real fact? Is that based on something or is it an exaggeration? Do they have in mind a specific diagnosis they want to reach and then pick and choose the facts that fit that diagnosis, and then ask yourselves what does that have to do with this man['s] coldly, calculated, preplanned murder of Keith Donaghy.

> What it really comes down to is requiring [defendant] to accept personal responsibility, personal responsibility for his acts. [Defendant] is personally responsible for the ultimate act, the killing of the innocent Keith Donaghy. That's the ultimate act and he should be required to accept the ultimate responsibility for that act and that's the death penalty.

Defense counsel immediately objected and moved for a mistrial, arguing that "[t]his is not about the acceptance of responsibility.... [The State is] making it appear like the presentation of mitigating factors is a denial of responsibility, where, in fact, it is a legal right."

The prosecutor denied that he implied that the presentation of mitigating evidence was a denial of responsibility. The court denied the motion for a mistrial and declined to provide a curative instruction. Defense counsel directly responded to the prosecutor's contentions about personal responsibility several times during his opening: "[T]his phase of this case has nothing to do with

acceptance or rejection of responsibility. It has to do with what is an appropriate punishment under all of the circumstances as the law allows." Later on in the opening, defense counsel stressed that "[t]hese [mitigating factors] are not excuses. If they were excuses they would be excuses of responsibility and would have been offered as to issues of guilt and innocence. They are not." In closing, defense counsel again reminded the jury that "[w]e are not talking about avoiding punishment here. We're merely talking about the measure of punishment." Defense counsel also added that "[t]his is no excuse. [It] gets [defendant] no walk in the park. If you spare his life, he would not be eligible, that is, even considered to be released from jail, for 30 real years.... There is no escaping responsibility."

During the State's closing, the prosecutor again said the case "comes down to personal responsibility." He stated that the aggravating factor outweighed any mitigating factors, and added that "the law gives you guidance that the death penalty makes him responsible for his ultimate act." Defendant did not object to the summation comments.

During its penalty-phase charge, the court instructed the jury that

it is important to remember that evidence of the presence of mitigating factors is not offered to justify or excuse the defendant's conduct. Rather, it is intended to present extenuating facts about the defendant's life or character or the circumstances surrounding the murder that would justify a sentence less than death.

Defendant argues that the prosecutor's comments improperly distracted the jury from performing their duty to weigh aggravating and mitigating factors by impermissibly characterizing the mitigating evidence as an effort to avoid responsibility. Mitigating evidence is not aimed at excusing or justifying a defendant's conduct; rather, its purpose is "to present extenuating facts regarding the defendant's life or character or the circumstances surrounding the murder that would justify a sentence less than death." *State v. Bey*, 129 *N.J.* 557, 620, 610 *A.*2d 814 (1992)(*Bey III*)(quoting *Bey II, supra*, 112 *N.J.* at 170, 548 *A.*2d 887). For a prosecutor to characterize a mitigating factor as an

"excuse" is improper. *Ibid.* In *Bey III, supra,* we determined that because the court sufficiently instructed the jury regarding the purpose of mitigating evidence, the prosecutor's mischaracterization did not have the capacity to cause an unjust result. *Id.* at 620–21, 610 *A.*2d 814.

In this case, the prosecutor did not employ the term "excuse." Nevertheless, the implication of the prosecutor's reference to "personal responsibility" is abundantly clear, and is tantamount to labeling mitigating evidence as an "excuse." Defense counsel did register a timely objection, unlike in *Bey III, id.* at 620, 610 *A.*2d 814, at least with regard to the State's opening statement. However, also unlike *Bey III,* defense counsel repeatedly countered the erroneous comments, vigorously arguing on several occasions that the mitigating evidence was not an attempt to excuse defendant's conduct or avoid personal responsibility for the murder. The court's unequivocal instructions also made clear to the jury that "the presence of mitigating factors is not offered to justify or excuse the defendant's conduct." Indeed, the instruction tracked the language this Court used in *Bey II, supra,* 112 *N.J.* at 170, 548 *A.*2d 887.

An immediate curative instruction would have been the preferred remedy. Nevertheless, we are satisfied that defense counsel's effective counterarguments, along with the court's clear instructions to the jury regarding the purpose of mitigating evidence, combined to render any prosecutorial misconduct harmless. This jury was made well aware of their responsibility and the proper role mitigating evidence was to play in the discharge of that responsibility.

B. Burden of Proof for Mitigating Factors

The trial court correctly instructed the jury that defendant bore the burden of coming forward with evidence of mitigating factors, but did not inform the jury that the State had the burden of disproving those factors. Defendant did not request such an instruction, and raises the court's omission as plain error. We

have addressed and rejected analogous claims in *State v. Chew*, 150 *N.J.* 30, 85, 695 *A.*2d 1301 (1997), and *Cooper, supra*, 151 *N.J.* at 396–97, 700 *A.*2d 306. We decline to depart from those holdings.

### C. . Alleged Introduction of Nonstatutory Aggravating Factor of Future Dangerousness

Dr. Dyer, a psychologist, testified for the defense and expressed the opinion that defendant would be amenable to rehabilitation based on his past experience with work and sports. On cross-examination, the prosecutor explored what might become of defendant during a long prison stay:

Q: And the tendency [in jail] is to learn from those other [inmates]?

A: I don't know if I would state that with any degree of certainty.

Q: Well, that's part of it, isn't it?

A: Well, optimumly [sic] he would learn from the people who were attempting to teach him a trade, educate him and counsel him.

Q: The other side is if you have a tendency to commit crimes and that's what you want to do, that's a good school to be in for an extended period of time?

A: Well, I will concede that.

Additionally, the defense called Dr. Latimer, a psychiatrist who testified that defendant was impulsive in stressful situations. During cross-examination of Dr. Latimer, the prosecutor arguably insinuated that the stress attendant to imprisonment might lead defendant to react violently. Defendant did not object to either cross-examination, and the prosecutor did not offer further comment during the State's summation.

Although defendant did not object, the court attempted to tailor its instruction to address any concerns raised by the cross-examination of defendant's experts. It informed the jury that it could consider as an aggravating factor only that the murder was alleged to have been committed in the course of a robbery; it reminded the jury that it could consider defendant's amenability to rehabilitation, but specifically warned against drawing an inference that defendant would "learn from the criminals and not the correction officials." Moreover, the court instructed the jury that

"if you have not decided upon death for the defendant, you must assume that his possible future release would not endanger society."

Defendant claims that the prosecutor's cross-examination of the two witnesses impermissibly and prejudicially introduced to the jury the nonstatutory factor of future dangerousness. The State may not advance that nonstatutory factor to justify a death sentence. *See, e.g., Coyle, supra,* 119 *N.J.* at 230–31, 574 *A.*2d 951; *Rose, supra,* 112 *N.J.* at 519–21, 548 *A.*2d 1058; *Ramseur, supra,* 106 *N.J.* at 321, 524 *A.*2d 188. If the State improperly offers that argument in support of a death sentence, the error may be deemed harmless if the court instructs the jury not to consider it. *See Loftin I, supra,* 146 *N.J.* at 390, 680 *A.*2d 677 (holding prosecutor's introduction of unalleged aggravating factor was rendered harmless by court's curative instruction).

We need not decide whether the prosecutor's cross-examination crossed the line from legitimate rebuttal of defendant's rehabilitation evidence into impermissible suggestions of defendant's future dangerousness. Even assuming error, we are confident that the court's detailed instruction, which specifically addressed and clarified the issue for the jury, sufficiently extinguished any possible prejudice to the defendant. Thus, any error was not capable of producing an unjust result.

D. Jury Knowledge, During Penalty Phase, of Probable Aggregate Noncapital Sentence

Prior to the commencement of the penalty phase proceedings, the trial court inquired whether defense counsel wished to have the jury informed of defendant's possible sentences on the noncapital convictions. Defense counsel agreed that such a disclosure was appropriate. During its introductory comments in the penalty phase, the court first reminded the jury that the murder conviction would result in at least thirty years' imprisonment without parole. It then explained that defendant could receive between ten and twenty years on the robbery charge, which

carried as much as ten years' parole ineligibility, and three to five years on the weapon charge, which could carry as much as two-and-one-half years' parole ineligibility. The court told the jury that those sentences could be served concurrently or consecutively to each other and/or to the murder conviction. It then admonished the jury:

> Those decisions are for me to make. The possible sentences for the other convictions should not influence your decision regarding the appropriateness of a death sentence on the murder charge. I'm giving you this information for your informational purposes only.

The next day, defense counsel informed the court that it objected to that aspect of the instruction that told the jury not to consider the sentences when weighing the appropriateness of a death sentence. The court disagreed, and provided the identical instruction at the conclusion of the penalty phase. Additionally, defense counsel stated during summation that defendant's total period of parole ineligibility "could be 42 and a half [years] and the parole board might not decide to let him out." After the death verdict, the court sentenced defendant to twenty years with ten years' parole ineligibility on the robbery conviction consecutive to defendant's death sentence and a five-year term on the weapon charge to run concurrent to the robbery sentence.

Defendant contends that the instruction was erroneous in two respects. First, defendant argues that the jury should have been permitted to consider the sentences to rebut the State's alleged reliance on defendant's future dangerousness. Defendant also submits that defendant's aggregate sentence should have been considered by the jury for purposes of mitigation, and that the court erred by not informing the jury that there was a "reasonable likelihood" that the sentence on the robbery conviction would be consecutive to the sentence for murder and that it would impose a ten-year parole-ineligibility period on the robbery conviction.

That a capital jury knows the potential legal effect of its decision is essential. *Mejia, supra,* 141 *N.J.* at 485, 662 *A.*2d 308; *Bey III, supra,* 129 *N.J.* at 601, 610 *A.*2d 814. In *Martini I, supra,* 131 *N.J.* at 313, 619 *A.*2d 1208, we set forth guidelines that

trial courts should follow when informing juries during the penalty phase of the possible sentences to be imposed on noncapital convictions arising from the same trial as the capital murder conviction, and held that although a jury should be informed of a defendant's possible sentences for other convictions, that information should not influence the jury's determination about the propriety of a death sentence. *Cf. Bey III, supra,* 129 *N.J.* at 603, 610 *A.*2d 814 (noting that "[t]he proper balance is struck" with an instruction informing jury of pending sentences for prior convictions, but instructing jury to base penalty-phase decision only on aggravating and mitigating factors). Such an instruction "will assist in dispelling confusion on the part of the jury and will help safeguard against improper sentencing determinations." *Martini I, supra,* 131 *N.J.* at 313, 619 *A.*2d 1208. The trial court's instructions conformed with that precedent. We reject defendant's argument that the noncapital sentences should have been considered by the jury in mitigation.

 Defendant's contention that the jury should have been told that there was a "reasonable likelihood" that defendant's noncapital sentences would be consecutive has the benefit of hindsight. In *Loftin I, supra,* although rejecting the argument that a lengthy noncapital sentence must be presented as a mitigating factor, we held that

> in future cases, if the court, based on the evidence presented believes that there is a realistic likelihood that it will impose a sentence to be served consecutively to any of defendant's prior sentences, in the event the jury does not return a death sentence, the jury should be so informed.
>
> [146 *N.J.* at 372, 680 *A.*2d 677.]

*Loftin I,* however, was decided several months after this defendant's trial concluded. The trial court's instruction fully complied with *Martini I*'s admonition that juries should be informed that "the [noncapital] sentence may or may not run consecutively to that for murder, but that the determination is left for the court." 131 *N.J.* at 313, 619 *A.*2d 1208. To the extent the court's statements to the jury concerning the likelihood that the sentences on the noncapital offenses would be imposed consecutive to the

sentence for murder do not comply with our ruling in *Loftin I,* we view the error as harmless. Defense counsel placed the possibility of defendant receiving consecutive sentences squarely before the jury, emphasizing that defendant's sentence "could be 42 and a half [years] and the parole board might not decide to let him out."

Nor are we persuaded that the alleged introduction of evidence of defendant's future dangerousness should affect our holding. Defendant asserts that *Simmons v. South Carolina,* 512 *U.S.* 154, 114 *S.Ct.* 2187, 129 *L. Ed.*2d 133 (1994), requires that the jury be permitted to counter the future dangerousness argument by considering in mitigation the total time defendant will be imprisoned. The Court held that because the defendant was by law required to serve a life sentence without possibility of parole, due process required the introduction of evidence concerning that sentence to rebut the State's assertion of future dangerousness. *Id.* at 156, 114 *S.Ct.* at 2190, 129 *L. Ed.*2d at 138. Here, however, the precise term of any noncapital sentence was uncertain, and defendant would, at some point, be eligible for parole. We note also that the prosecutor here did not specifically argue the future dangerousness posed by defendant, thereby further distinguishing this case from *Simmons.* Even if the oblique references the prosecutor elicited during cross-examination of the defense witnesses amounted to an introduction of the nonstatutory aggravating factor of future dangerousness, we are satisfied that the firm and clear instructions provided by the court sufficiently corrected any misperception by the jury that defendant's future dangerousness independently could justify the death penalty.

## VI

### Other Issues

#### A. Constitutionality of Death Penalty Statute

Defendant asserts that the New Jersey death-penalty statute is unconstitutional because it "fail[s] to adequately narrow and define the class of individuals eligible for death . . . and fail[s] to provide for a system of meaningful appellate review." We have consis-

tently rejected constitutional challenges to the Capital Punishment Act, *see Ramseur, supra,* 106 *N.J.* at 166–211, 524 *A.*2d 188, and continue to do so today.

### B. Proportionality Review

Pursuant to the Capital Punishment Act, *N.J.S.A.* 2C:11–3e, defendant requests a determination whether his "sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Review of defendant's sentence will proceed in accordance with a briefing and argument schedule to be established by the Clerk of the Court after consultation with counsel.

### VII

We affirm defendant's convictions and sentence of death.

HANDLER, J., dissenting.

Today, the Court again affirms a capital-murder conviction and death sentence despite egregious errors in the jury charges and extreme prosecutorial misconduct. Once again, the Court repeats resolute principles that are designed to maximize a defendant's protections and to achieve fairness, to the greatest extent possible, in capital cases. Once again, the Court, conceding that those principles have been violated, nonetheless finds those violations inconsequential. It is distressing that this Court, in cases involving the prosecution for capital murder, has come to honor guarantees of due process and fairness in the breach. It ought not affirm a capital-murder conviction and death sentence when critical doubts in their validity exist. I therefore dissent.

The majority upholds defendant's death sentence though the guilt-phase jury charge in respect of the own-conduct determination was confusing, contradictory, and inaccurate. I believe that the deficiencies in the jury instructions warrant reversal of the own-conduct determination and, thus, reversal of defendant's

death sentence. Consequently, I join Justice O'Hern's dissenting opinion.

In addition, I believe that the prosecutor's repeated acts of misconduct require reversal of defendant's purposeful-or-knowing murder conviction and death sentence. In my opinion, the trial court's erroneous penalty-phase ultimate-outcome instruction also mandates reversal of defendant's sentence. I write separately on these points.

I

On three occasions, the prosecutor crossed the bounds of legitimate argument or questioning and engaged in misconduct. By considering each instance in isolation, the majority devalues the prejudicial impact of the prosecutor's misconduct. When the instances of the misconduct are appraised together, the totality of the misconduct and the prejudice to defendant compel reversal of defendant's purposeful-or-knowing murder conviction and death sentence. Further, the prosecutor's guilt-phase summation, in which despite the utter absence of evidence he described authoritatively and in vivid detail the robbery and murder of Keith Donaghy, by itself mandates reversal of defendant's murder conviction and death sentence.

A.

The State presented evidence of the events before and after the approximately one hour during which Michael Mills and defendant were absent from the Columbia Cafe on the night of October 6, 1993. According to the State's evidence, Mills and defendant looked for a car prior to leaving the bar. They possessed a gun when they left the bar. They drove off in Renee Burkhardt's car with Mills behind the wheel. An hour later Mills, and subsequently defendant, returned to the bar. Later that evening, defendant made inculpatory statements regarding the robbery and murder of Donaghy.

Except for the fact that Donaghy was shot by the gun Mills and defendant had possessed and was robbed, the State did not present any evidence about what had actually occurred during the hour after Mills and defendant had left the Columbia Cafe. The State did not produce any eyewitness testimony or forensic evidence that shed any light on exactly what had happened during that hour or so. Defendant's oral statements provided the only description of the crime.

The State possessed additional, but inadmissible, evidence pertaining to the commission of the murder and robbery. Prior to committing suicide, Mills gave a statement to the police. In that statement, Mills detailed what had occurred from the time he and defendant left the Columbia Cafe through the moment he returned to the bar. The jury was aware that Mills had committed suicide prior to trial.

The absence of admissible evidence did not deter the prosecutor from offering an animated description of the crime. He stated:

So what happens? Around 8:00 Mills and Feaster pull out. Mills is the driver. Somewhere along that route [defendant's] first act of intent to kill, first act of purpose, preplanned, premeditated, intent to kill occurs. He takes the shotgun and loads it with the slug.

Defense counsel immediately objected, but the trial court, characterizing the prosecutor's statement as an inference, concluded that the prosecutor's statement was permissible.

The prosecutor continued:

Well, maybe he doesn't do it during the ride, but the act of putting this slug into this weapon is an intent, an intent to use this gun, use it with a slug. It's not the bird shot, or whatever you would use for small game. This is a slug, this is a three quarter ounce piece of lead. That's his first act of intent.

\* \* \*

[Defendant] and Mills are headed towards the gas station with him intent on killing Keith. As [Wr]igley puts it, he wanted to feel what it was like to kill. And what you find from the pictures and the video [of the crime scene] is that is what his intent was when he went in that station, first to kill.

What do they do? They drive down the front. Here is Ogden Road. They drive in front of the station. And here are the windows. Keith is seated here. They

can see that he's alone, seated there doing his job. They continue down. And they go down the road between the Texaco and—

Defense counsel, citing the lack of evidentiary support for the prosecutor's statements, again objected. The trial court instructed the prosecutor not to ask for speculation and exhorted him to ask merely for inferences based on the record. The prosecutor did not heed the court. He next stated to the jury: "Pulled down Georgetown Road and park. Mills is going to—he's going to be the getaway driver. What does Feaster do? It's loaded—not now—." Defense counsel objected for a third time. At a sidebar conference, the trial court concluded that the prosecutor's comments were proper. When defense counsel questioned the evidentiary basis for the prosecutor's statement that Mills was the getaway driver, the prosecutor insisted that he had never made that statement.

The prosecutor went on in the same vein:

The second act of his intent of this premeditation to kill is, Sergeant Hannigan says you can pull the trigger all day long on this shotgun and it doesn't go off. All day long. What do you have to do in order for the shotgun to fire? You have to cock the hammer back. That act is intent to use this to kill someone, armed with the pumpkin ball slug in this gun. And that is done before he gets into the gas station, because he does not have time once he's in the station to cock this gun. That is done while he is on his way into the station.

And how does he go? He goes along this way, from the bays, he sneaks across, and there is the door. Keith, who is looking out the windows, doesn't see him because he's coming from the blind side. And what does he do? With the hammer cocked, he shoulders into the door. Remember, it opens inside, from the inside. He shoulders in the door like this.

The prosecutor subsequently filled in the canvas painting a descriptive picture of the shooting and the assailants' ride from the gas station.

After the prosecutor completed his summation, defense counsel futilely reiterated his objections. Because defense counsel had already given his closing argument, he could not respond to the prosecutor's remarks.

Several aspects of the prosecutor's closing argument went far beyond argument presenting reasonable inferences from the evidence. Due to the absence of the supporting evidence and any

clarifying or cautionary instruction that the prosecutor's remarks could at most be considered possible inferences to be drawn from the evidence, the jury likely believed those remarks were based directly on evidence in the State's possession and that Mills was the source for the prosecutor's narrative.

A prosecutor's "summation 'is limited to commenting upon the evidence and the reasonable inferences to be drawn therefrom.'" *State v. Johnson,* 120 *N.J.* 263, 296, 576 *A.*2d 834 (1990) (quoting *State v. Bucanis,* 26 *N.J.* 45, 56, 138 *A.*2d 739, *cert. denied,* 357 *U.S.* 910, 78 *S.Ct.* 1157, 2 *L. Ed.*2d 1160 (1958)); *accord State v. Chew,* 150 *N.J.* 30, 84, 695 *A.*2d 1301 (1997), *State v. Dixon,* 125 *N.J.* 223, 259, 593 *A.*2d 266 (1991); *State v. Zola,* 112 *N.J.* 384, 426, 548 *A.*2d 1022 (1988); *State v. Smith,* 27 *N.J.* 433, 460, 142 *A.*2d 890 (1958). As Justice Brennan expounded:

> No authority questions that the broadest latitude in summation must be allowed the prosecutor and defense counsel alike to advocate their respective positions before the jury in order that justice and right be done. But every statement of the rule in our own reports emphasizes that comment must be restrained within the facts shown or reasonably suggested by the evidence adduced.
>
> [*State v. Bogen,* 13 *N.J.* 137, 140, 98 *A.*2d 295 (1953).]

Despite this Court's repeated admonitions to prosecutors regarding the legal and ethical requirement to base closing arguments on the evidence in the record, *see, e.g., State v. Farrell,* 61 *N.J.* 99, 104, 293 *A.*2d 176 (1972), many portions of the prosecutor's account of the crime exceeded the permissible seeking of reasonable inferences from the evidence presented at trial and sharing those inferences—as inferences—with the jury.

Despite the majority's contrary assertions, the prosecutor's characterization of Mills as the otherwise-innocent getaway driver finds minimal support in the record evidence. Though the evidence suggests that Mills drove to and from the crime scene, it hardly establishes that Mills never alighted from the driver's seat of Burkhardt's car. No evidence shows that Mills merely waited in the car during the robbery and killing. While defendant had planned to commit a robbery before he secured Mills's involvement, that fact also fails to substantiate the prosecutor's deeming

Mills the passive getaway driver. The majority holds that the prosecutor's characterization of Mills as the getaway driver, "although approaching the fine line that separates forceful from impermissible closing argument, [was a] fair inference[ ] to be drawn from the record." *Ante* at 62, 716 *A.*2d at 425 (internal quotations and citation omitted). In my opinion, the prosecutor crossed the line. Given that hardly any evidence supported the inference that Mills was nothing more than a passive getaway driver, the prosecutor's bald, unqualified, declarative assertion that Mills played an insubstantial role was improper. The statement was one of fact, not inference, and it was too attenuated to be passed off as a fact or inevitable inference.

The Court acknowledges that the prosecutor's comment that defendant loaded and cocked the gun during the car ride was improper. *See ante* at 62, 716 *A.*2d at 425. The prosecutor's assertion that defendant loaded and cocked the gun in the car finds absolutely no support in the record. The gun could have been loaded long before defendant retrieved it from Tina Shiplee's trunk; perhaps the gun was loaded when Daniel Kaighn lent it to defendant. Not a shred of evidence suggests that the gun was not loaded when Mills and defendant left the Columbia Cafe. The claim that defendant cocked the gun while in the car is similarly far-fetched. It does not take long to cock a gun. Defendant could have cocked it at any time, including the second before shooting the victim. Thus, the prosecutor's declaration that defendant loaded and cocked the gun while Mills drove him to the gas station has no support in the record and was highly inappropriate.

The Court also concedes that the prosecutor's pronouncements that defendant shouldered the door in a specific manner and approached Donaghy from the blind side constituted prosecutorial misconduct. *See ante* at 63, 716 *A.*2d at 426. The record contained no evidentiary basis for those comments.

By speaking in short, staccato, declarative sentences, the prosecutor presented his unreasonable inferences as incontrovertible

facts. The manner in which the prosecutor named Mills the getaway driver gave unwarranted weight to the impermissible inference made from the attenuated evidence adduced at trial. Similarly, the way the prosecutor confidently described how defendant purportedly loaded and cocked the gun during the ride to the gas station obfuscated the fact that the allegations had absolutely no evidentiary support and imported an inaccurate aura of authenticity into the prosecutor's unfounded accusations. The manner in which the prosecutor delivered his closing argument accentuates the impropriety of the prosecutor's summation and escalates the prejudicial impact on defendant.

Though finding several of the prosecutor's comments to be "inappropriate," the Court is "not persuaded that in the context of the entire trial the prosecutor's comments had the capacity to deprive defendant of a fair trial." *Ante* at 63, 716 *A*.2d at 426. I disagree. In my opinion, the summation prejudiced defendant and that the prosecutorial misconduct was " 'so egregious that it deprived defendant of a fair trial.' " *State v. Harvey*, 151 *N.J.* 117, 216, 699 *A*.2d 596 (1997) (*Harvey II* ) (quoting *State v. Ramseur*, 106 *N.J.* 123, 322, 524 *A*.2d 188 (1987)). Accordingly, I believe that reversal of defendant's purposeful-or-knowing murder conviction and death sentence is mandated. *See State v. Rose*, 112 *N.J.* 454, 524, 548 *A*.2d 1058 (1988) (reversing death sentence because prosecutorial misconduct deprived defendant of fair penalty trial).

As the Court recognizes: "In resolving whether the misconduct is prejudicial and thus denied defendant a fair trial, we will consider whether counsel registered a timely objection, whether the remark was withdrawn promptly, and whether the court struck the remarks and ordered the jury to disregard them." *Ante* at 59, 716 *A*.2d at 424. All of these factors serve to undermine defendant's murder conviction and death sentence. During the prosecutor's summation, defense counsel objected several times. With the exception of one minor qualification, the prosecutor never withdrew his remarks. Moreover, the trial

court, deeming the summation proper, did not strike any of the prosecutor's improper remarks.

Referring to matters outside the record is a serious transgression from the prosecutor's duty to deliver a summation based on the evidence adduced at trial. *E.g.*, *Bogen*, 13 *N.J.* at 139–41, 98 A.2d 295; *see also ABA Standards for Criminal Justice* § 3–5.8a (3d ed. 1993) (*ABA Standards*) ("In closing argument to the jury, the prosecutor may argue all reasonable inferences from evidence in the record. The prosecutor should not intentionally misstate the evidence or mislead the jury as to the inferences it may draw."); *id.* at § 3–5.8, comment ("Assertions of fact not proven amount to unsworn testimony of the advocate and are not subject to cross-examination."); *id.* at § 3–5.9 ("The prosecutor should not intentionally refer to or argue on the basis of facts outside the record."). The egregiousness of the prosecutor's conduct is intensified in this case because the apparent source for the prosecutor's extra-record assertions was Mills's statement, which was not subject to cross-examination. Referring to extra-record matters within one's personal knowledge is one of the gravest forms of prosecutorial misconduct.

The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, *improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.*

[*Berger v. United States*, 295 *U.S.* 78, 88, 55 *S.Ct.* 629, 633, 79 *L. Ed.* 1314, 1321 (1935) (emphasis added).]

*See also New Jersey Rules of Professional Conduct* (*RPC*) 3.4e (forbidding attorneys from "assert[ing] personal knowledge of

facts in issue"). In this case, little, if any, evidence adduced at trial supported the prosecutor's assertions that Mills was a mere getaway driver, that defendant loaded and cocked the gun during the ride to the gas station, and that defendant approached Donaghy from the blind side. Yet, the jury was aware that Mills, prior to committing suicide, had spoken to police. The jury knew that Mills had informed police officers of the location of the discarded gun. It is thus extremely likely, given the prosecutor's dogmatic presentation, that the jury inferred that Mills had told the police his version of events surrounding the robbery and murder, and readily surmised that Mills's statement to police was the source for the prosecutor's extra-record allegations.

While the prosecutor neither expressly used Mills's statement to fill the evidentiary gaps nor explicitly attributed to Mills the factual information that he imparted, the appearance of the prosecutor illicitly referring to the statement was unmistakable. Although the jury was unaware of the actual contents of Mills's statement, because the prosecutor confidently told the jury what had happened after Mills and defendant had left the Columbia Cafe, the jury could not know that the prosecutor's summation did not parrot Mills's statement.

The prosecutor's summation carried tremendous weight.

[B]ecause the prosecutor represents the government and people of the State, it is reasonable to say that jurors have confidence that he will fairly fulfill his duty to see that justice is done whether by conviction of the guilty or acquittal of the innocent. His comments in summation whether proper or improper carry with them the authority of all he represents. It is unlikely a juror will believe a prosecutor would intentionally mislead him.

[*Farrell, supra,* 61 *N.J.* at 105, 293 *A.2d* 176 (citation omitted).]

*Accord Berger, supra,* 295 *U.S.* at 88, 55 *S.Ct.* at 633, 79 *L. Ed.* at 1321; *see also ABA Standards, supra,* § 3–5.8, comment ("The prosecutor's argument is likely to have significant persuasive force with the jury. Accordingly, the scope of argument must be consistent with the evidence and marked by the fairness that should characterize all of the prosecutor's conduct. Prosecutorial conduct in argument is a matter of special concern because of the possibility that the jury will give special weight to the prosecutor's

arguments, not only because of the prestige associated with the prosecutor's office, but also because of the fact-finding facilities presumably available to the office."). In finding the prosecutorial misconduct harmless, the majority chooses to underestimate the power of the prosecutor's summation. When juxtaposed against this Court's commitment to guard against prosecutorial misconduct in capital cases, *see Ramseur, supra,* 106 *N.J.* at 323–24, 524 *A.*2d 188, that choice is most difficult to comprehend. The prosecutor's baseless allegations impacted the jury's guilt-phase finding that defendant had intended to kill Donaghy and that defendant had killed by his own conduct. In addition, by unjustifiably embellishing defendant's premeditation, the prosecutor's summation affected the jury's penalty-phase verdict.

The prosecutor's characterization of Mills as a mere getaway driver tainted the own-conduct determination. By asserting that Mills was the passive getaway driver, the prosecutor likely distorted the jury's view of the testimony, which contained minimal evidence suggesting that Mills simply sat in the car while defendant went into the gas station. The prosecutor virtually foreclosed the possibility that Mills could have shot Donaghy by asserting, without support or qualification, that Mills merely waited in the car while defendant committed the robbery and murder.

The prosecutor's unfounded allegations that defendant loaded and cocked the gun during the ride to the gas station and that defendant blindsided Donaghy likely contaminated the jury's finding that the homicide was purposeful or knowing. At a minimum, those accusations, which exaggerated defendant's premeditation, corrupted the jury's decision to sentence defendant to die. *See State v. Marshall,* 130 *N.J.* 109, 155, 613 *A.*2d 1059 (1992) (*Marshall II* ) (recognizing degree of premeditation influences deathworthiness), *cert. denied,* 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L. Ed.*2d 694 (1993). The prosecutor's comments critically bolstered the State's theory that defendant intended to kill when he designed the plan to rob the gas station.

Although the trial court instructed the jury that it had to rely on its own, rather than the attorneys', recollection of the facts, defendant's murder conviction and death sentence cannot stand. The prosecutor's summation caused irremediable damage and rendered the court's admonition impotent. The prosecutor's unjustified allegations concerned the critical issues of premeditation and own conduct. Moreover, the declarations were not even phrased as requests that the jury draw certain inferences; rather, they were stated as factual and evidential in nature. Given the nature of the remarks and the trial court's refusal to cure the error despite counsel's objections, the instruction could not have had a sufficiently curative effect to counter the prejudice that the prosecutor's remarks likely engendered.

Likewise, the prosecutorial misconduct requires reversal despite the existence of evidence suggesting that defendant, by his own conduct, purposefully murdered Donaghy. Though defendant allegedly made numerous statements in which he admitted to fatally shooting Donaghy, doubts regarding whether those statements were ever made precludes a finding that the prosecutor's characterization of Mills as a mere getaway driver was harmless. The witnesses accusing defendant of having admitted to committing the murder gave testimony that contradicted other witnesses' and sometimes their own testimony. In addition, defense counsel vigorously impeached those witnesses, who either had criminal records or promises of a reward conditioned upon defendant's murder conviction. Moreover, many of these witnesses were drug users who were under the influence of drugs or alcohol on the night of the crimes. Besides, Mills's suicide illustrates a consciousness of guilt that could give rise to the inference that he, not defendant, was the triggerman. Therefore, the prosecutorial misconduct tainted the own-conduct determination.

The circumstantial evidence implying that the killing of Donaghy was intentional paled in comparison to the prosecutor's ungrounded assertions that defendant had loaded and cocked the gun during the car ride and had blindsided Donaghy. Even

assuming that the prosecutorial misconduct did not infect the jury's determination that the murder of Donaghy was purposeful or knowing, the baseless allegations of premeditation affected the penalty-phase deliberations. A defendant's degree of premeditation critically influences his deathworthiness. *See State v. Martini*, 139 *N.J.* 3, 53, 651 *A.*2d 949 (1994) (*Martini II* ), *cert. denied*, 516 *U.S.* 875, 116 *S.Ct.* 203, 133 *L. Ed.*2d 137 (1995); *Marshall II, supra*, 130 *N.J.* at 155, 613 *A.*2d 1059. The prosecutor's unfounded exaggeration of defendant's premeditation contaminated the penalty-phase deliberations.

The prosecutor's characterization of Mills as a mere getaway driver requires reversal of the own-conduct determination. Furthermore, the prosecutor's unjustified allegations that defendant loaded and cocked the gun while Mills drove to the gas station and that defendant approached Donaghy from the blind side compel reversal of the purposeful-or-knowing murder conviction. At a minimum, those accusations poisoned the penalty-phase deliberations and mandate reversal of defendant's death sentence.

## B.

The guilt-phase summation was not the only instance in which the prosecutor acted improperly. During his opening and closing arguments in the penalty phase, the prosecutor argued that defendant's presentation of mitigating evidence amounted to an attempt to evade personal responsibility for the commission of the robbery and murder.

In his penalty-phase opening statement, the prosecutor argued:

Use your common sense. Ask yourselves what they present, is that based on a real fact? Is that based on something or is it an exaggeration? Do they have in mind a specific diagnosis they want to reach and then pick and choose the facts that fit that diagnosis, and then ask yourselves what does that have to do with this man['s] coldly, calculated, preplanned murder of Keith Donaghy.

What it really comes down to is requiring Mr. Feaster to accept personal responsibility, personal responsibility for his acts. Mr. Feaster is personally responsible for the ultimate act, the killing of the innocent Keith Donaghy. That's the ultimate act and he should be required to accept the ultimate responsibility for that act and that's the death penalty.

In response to defense counsel's objection and motion for a mistrial, the prosecutor once again denied that he had made the statement to which defense counsel objected.[1] This time, the prosecutor claimed that he had never implied that defendant sought to avoid personal responsibility by offering mitigating evidence. Based on the prosecutor's misrepresentation, the court overruled the objection and denied defendant's motion for a mistrial.

In his penalty-phase summation, the prosecutor again failed to refrain from referring to personal responsibility. He began his summation as follows: "Ladies and gentlemen, it comes down to personal responsibility. Richard Feaster is personally responsible for the ultimate act, killing of an innocent human being, and he must be held responsible for that act."

I concur with the Court's conclusion that the prosecutor's argument was improper. *See ante* at 86–87, 716 *A.*2d at 438; *see also State v. Bey*, 129 *N.J.* 557, 620–21, 610 *A.*2d 814 (1992) (*Bey III* ) (holding prosecutor's comment that defendant's mitigating evidence was "not an excuse" had been improper), *cert. denied,* 513 *U.S.* 1164, 115 *S.Ct.* 1131, 130 *L. Ed.*2d 1093 (1995). However, I disagree with the Court's approach of only considering independently this instance of prosecutorial misconduct. Rather, to measure its effects, the misconduct should be aggregated. When considered in its entirety, the prosecutorial misconduct was not harmless.

## C.

The prosecutor again acted improperly when he cross-examined two defense experts. At the penalty phase, Frank Dyer, a

---

[1] *RPC* 3.3(a)(1) forbids attorneys from knowingly "mak[ing] a false statement of material fact ... to a tribunal." If the prosecutor was aware that he was falsely denying that he had made improper comments to the court, he twice committed a severe violation of his ethical obligation to be candid toward the tribunal. The fact that he made two false denials suggest that his misrepresentations were not accidental.

psychologist, and Robert Latimer, a psychiatrist, testified that defendant was amenable to rehabilitation. The prosecutor construed the defense's line of questioning as an invitation to demonstrate defendant's alleged future dangerousness, an impermissible nonstatutory aggravating factor.

The cross-examination of Dyer proceeded as follows:

Q: You talk about rehabilitation in prison, if he learns a straight trade, that's going to rehabilitate him?

A: It would equip him with the means of making a living.

Q: Okay.

A: I'm not saying that in and of itself is going to produce rehabilitation.

Q: But that would be part of—in your evaluation of Mr. Feaster, the trade would help in rehabilitating him from committing other crimes?

A: That would play a role.

Q: Did you read Ms. Feldman's report about Mr. Feaster and his selling of the money—selling of the drugs for money?

A: Yes.

Q: Okay. And in that he describes how he saw the other people selling drugs and realized that they made more money than he did and didn't have to work as hard, is that correct?

A: Yes.

Q: Okay. And that he began selling these drugs at night after graduating from high school. He further describes how he worked 12 hours a day doing concrete work, would come home in the evening, wash, eat, and go out selling drugs. He said he did this to make money. How is that consistent with, if you teach Richard Feaster a trade, he will be rehabilitated?

A: Well, as I stated before, I did not testify that merely teaching him a trade would affect his rehabilitation, but that it would further that cause.

Q: Okay. But as he's describing this to Ms. Feldman, he already has a trade, he's working, concrete, but he wants to make easier money later that night.

A: This defendant's perspective on life matters, I think, would change during the lengthy period of incarceration.

Q: Yes. Because he would be in a state prison with other felons, correct?

A: Well, I think it would be because he would be deprived of his liberty for an extended period of time.

Q: He's deprived of liberty, in contact with other felons, is that correct?

A: Well, yes.

Q: And the tendency there is to learn from those other people?

A: I don't know if I would state that with any degree of certainty.

Q: Well, that's part of it, isn't it?

A: Well, optim[ally] he would learn from the people who were attempting to teach him a trade, educate him and counsel him.

Q: The other side is if you have a tendency to commit crimes and that's what you want to do, that's a good school to be in for an extended period of time?

A: Well, I will concede that.

After cross-examining Latimer regarding testimony that defendant was very impulsive and was prone to losing control when under stress, the prosecutor embarked on this line of questioning:

Q: What is the bottom line as far as what made him kill an innocent human being?

A: ... This is a young man who's very troubled, who comes from a very troubled home, who has a hole in his head from atrophy of the frontal lobe on the lobe that controls judgment and thought-out activities, who has a low IQ to the level of borderline retardation, who is under stress, who is awaiting to go into the Marines, who has a horrible child upbringing with a great deal of repressed anger and at a given moment commits a planned act that goes sour.

Q: What would you say about the stress that is present in a prison system?

A: I don't understand; you have to be more specific.

Q: Would you say that's a stressful situation, being in a prison?

A: Prison and divorce are just about the two most stressful things I hear from the statisticians. Death in the family, prison, divorce is right up there, but you have to understand that human beings are adaptive machines. Our brain is nothing but a machine to adapt. People adapted to the concentration camps. We can adapt to loss of loved ones. We can adapt to the most unfortunate circumstances, because that is a function of our brain. We are machines of adaptation, so I think that he can adapt to the prison system.

It certainly will take a long time, and in the prisons people are put on suicide watch routinely, especially in lock-ups, in jails. The most frequent suicide takes place in the police lock-ups, in the city jails, because—

\* \* \*

Q: How do you think that would affect Mr. Feaster, the stress in prison?

A: It's going to affect him the same as it affects most people who are in prison. It's a terrible thing.

Q: Would you say that it's more stressful than going into the Marines?[2]

A: Of course, certainly.

---

[2] The reference to the Marines came from the fact that, at the time of the murder, defendant was about to join the Marines, which according to Kevin Wrigley was one reason why defendant wanted to know what it was like to kill. The prosecutor insinuated that because the stress of entering the Marines caused defendant to kill, the stress of being incarcerated could have a similar effect.

The prosecutor's cross-examination of Dyer and Latimer exceeded mere rebuttal of evidence pertaining to defendant's capacity for rehabilitation, one of defendant's proposed catch-all mitigating factors, and instead improperly attempted to establish that defendant's alleged future dangerousness justified the imposition of a death sentence. *See State v. Coyle*, 119 *N.J.* 194, 230–31, 574 *A.*2d 951 (1990) (forbidding State from advancing future dangerousness nonstatutory aggravating factor); *Rose, supra,* 112 *N.J.* at 520–21, 548 *A.*2d 1058 (same); *Ramseur, supra,* 106 *N.J.* at 321, 524 *A.*2d 188 (same). During the cross-examination of Dyer, the prosecutor made generalizations about prison life and strongly implied that defendant, due to his tendency toward criminality, learn from other prisoners to commit more crimes. Similarly, while cross-examining Latimer, the prosecutor suggested that the stress of prison life would cause defendant to lose control and act impulsively. These lines of questioning pertained to defendant's alleged future dangerousness. In both instances, the prosecutor took the conclusions of defendant's mitigation experts—that defendant was amenable to rehabilitation in a structured prison environment and that stress predisposed defendant to lose control—and, instead of rebutting the conclusions by attempting to prove their falsity, used them as aggravating circumstances. In addition to appropriately asserting that prison would not rehabilitate defendant and that defendant's lack of control was not a mitigating circumstance, the prosecutor contended that if defendant were allowed to spend his life in prison, incarceration would make him a hardened criminal and cause him to lose control and act on that enhanced criminality. A prosecutor cannot utilize mitigating evidence to show that a defendant is a future danger. A vast distinction exists between undermining mitigating evidence and accepting that evidence as proof of a nonstatutory aggravating factor. By doing the latter, the prosecutor acted improperly.

The Court determines that if the prosecutor had improperly asserted the future dangerous nonstatutory aggravating factor, the court's curative instruction rendered the error harmless. *Ante* at 89, 716 *A.*2d at 439. I do not agree. I believe that the

assertion of defendant's alleged future dangerousness, when considered along with the prosecutor's improper comments at the guilt-phase and penalty-phase summations and the penalty-phase opening argument, necessitates reversal of defendant's death sentence. *See State v. Pennington,* 119 *N.J.* 547, 611, 575 *A.*2d 816 (1990) (Handler, J., concurring and dissenting) (concluding assertions of future dangerousness, among other prosecutorial misconduct, required reversal of death sentence); *State v. Long,* 119 *N.J.* 439, 526–27, 575 *A.*2d 435 (1990) (Handler, J., concurring and dissenting) (same).

### D.

The Court has often forcefully condemned prosecutorial misconduct. Forty-three years ago, Chief Justice Vanderbilt wrote:

> A public prosecutor must not only be zealous in enforcing the law, he must consistently refrain from any conduct that is lacking in the essentials of fair play. Where his conduct has crossed the line and resulted in foul play, we have not hesitated to reverse the decision below and remand it for a new trial. The right to a fair trial must be preserved by every means at our command.
>
> [*State v. D'Ippolito,* 19 *N.J.* 540, 550, 117 *A.*2d 592 (1955).]

*See also State v. West,* 29 *N.J.* 327, 338, 149 *A.*2d 217 (1959) ("[The prosecutor] is not an ordinary adversary; he represents the State whose interest is served by an untainted judgment firmly rooted in facts alone."). Despite the fact that the prosecutor in this case crossed the line and engaged in foul play, the Court hesitates to reverse defendant's murder conviction and death sentence. In so doing, the majority disregards this Court's pledge to patrol vigilantly prosecutorial misconduct in capital cases. In *Ramseur, supra,* 106 *N.J.* at 323–24, 524 *A.*2d 188, this Court wrote:

> Prosecutors in capital cases are hereby on notice that in the future, this Court will not hesitate to refer on its own motion possible violations of the special ethical rules governing prosecutors to the appropriate district ethics committee for disciplinary action. We are well aware that within the legal profession the prosecutor's double calling—to represent vigorously the state's interest in law enforcement and at the same time help assure that the accused is treated fairly and that justice is done—is uniquely challenging. That challenge is what makes the prosecutor's mission such a difficult one and such an honorable one. A prosecutor willing to engage in proscribed conduct to obtain a conviction in a capital case betrays his oath in both

its respects. Not only does he scoff at rather than seek justice, he also represents the state poorly. *Because death is a uniquely harsh sanction, this Court of necessity will more readily find prejudice resulting from prosecutorial misconduct in a capital case than in other criminal matters;* prosecutors who fail to take seriously their particularly stringent ethical obligations in capital cases thus strongly risk postponing, and even jeopardizing, the enforcement of the law. We are confident that our prosecutors will be equal to this ethical challenge, but we also stand ready to take whatever action is required to remedy any abuses.

[ (emphasis added).]

In this case, the majority does not assiduously guard against prosecutorial excess. Rather, the Court deceptively deflates the prejudicial impact of the prosecutorial misconduct by isolating each instance of impropriety and overstating the strength of the State's case against defendant.

Sadly, the Court's decision is not an aberration. With the exception of *Rose, supra,* 112 *N.J.* at 524, 548 *A.2d* 1058, this Court has repeatedly rejected powerful claims of prosecutorial misconduct in capital cases. *See Harvey II, supra,* 151 *N.J.* at 216–20, 699 *A.2d* 596; *State v. Marshall,* 123 *N.J.* 1, 152–64, 586 *A.2d* 85 (1991) (*Marshall I* ), *cert. denied,* 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L. Ed.*2d 694 (1993); *State v. Hightower,* 120 *N.J.* 378, 411–12, 577 *A.2d* 99 (1990) (*Hightower I* ); *State v. Koedatich,* 112 *N.J.* 225, 320–25, 548 *A.2d* 939 (1988) (*Koedatich I* ); *State v. Biegenwald,* 106 *N.J.* 13, 40–41, 524 *A.2d* 130 (1987) (*Biegenwald II* ); *Ramseur, supra,* 106 *N.J.* at 323, 524 *A.2d* 188. By not reversing defendant's capital-murder conviction and death sentence despite deplorable and prejudicial prosecutorial misconduct, this Court's promise in *Biegenwald II, supra,* 106 *N.J.* at 40, 524 *A.2d* 130, to "scrupulously review" claims of prosecutorial misconduct in capital cases appears illusory.

## II

The trial court imposed maximum sentences on defendant's robbery and possession of an unlawful weapon convictions. The court sentenced defendant to a consecutive twenty-year prison term with a ten-year parole disqualifier for robbing Donaghy. It sentenced defendant to a concurrent five-year prison term with a

two-and-one-half-year parole disqualifier for possessing a sawed-off shotgun.

In the penalty-phase charge, the court informed the jury of the maximum sentences for defendant's noncapital convictions. The court did not tell the jury that it would, or was likely to, impose consecutive sentences. The court also instructed the jury that "[t]he possible sentences for the other convictions should not influence your decision regarding the appropriateness of a death sentence on the murder charge." In my opinion, by not informing the jury that it was likely to impose a consecutive sentence for the robbery conviction, the court committed reversible error. *See State v. Harris*, 156 *N.J.* 122, 246–50, 716 *A.*2d 458 (1998) (Handler, J., dissenting). The court's instruction to disregard the noncapital sentences was erroneous. *See State v. Nelson*, 155 *N.J.* 487, 504–05, 715 *A.*2d 281 (1998). The error demands reversal of defendant's sentence. *See id.* at 527, 715 *A.*2d 281 (Handler, J., dissenting).

The court's likelihood of imposing a consecutive sentence on the robbery conviction can be inferred from its ultimate imposition and the history of courts consistently imposing consecutive sentences in capital cases. In *Harris, supra*, 156 *N.J.* at 246, 716 *A.*2d 525 (Handler, J., dissenting), *State v. Morton*, 155 *N.J.* 383, 410, 715 *A.*2d 228 (1998), and *State v. Nelson*, 155 *N.J.* 487, 496, 715 *A.*2d 281 (1998), the trial courts imposed maximum consecutive sentences on each defendant's noncapital convictions. The trial court in *State v. Martini*, 131 *N.J.* 176, 207, 619 *A.*2d 1208 (1993) (*Martini I* ), *cert. denied*, 516 *U.S.* 875, 116 *S.Ct.* 203, 133 *L. Ed.*2d 137 (1995), imposed the defendant's capital sentence consecutively to his kidnapping sentence. In *Loftin, supra*, 146 *N.J.* at 333, 680 *A.*2d 677, the court imposed the defendant's capital sentence consecutively to the life sentence he received for committing a prior murder. Due to courts' repeated imposition of consecutive sentences on capital defendants, one can fairly infer that, at the time of the penalty-phase charge, the trial court intended to levy

the consecutive robbery sentence it ultimately imposed on defendant.

Had the jury been aware that defendant would not have been eligible for parole for forty years, the highly subjective penalty-phase deliberations may have been affected. If defendant had not been sentenced to death, his commission of the robbery and murder in this case would have precluded his parole eligibility until defendant reached the age of sixty-two, an age at which people rarely engage in violent criminal behavior. In *State v. Davis*, 96 *N.J.* 611, 617, 477 *A.*2d 308 (1984), this Court held that empirical data regarding the diminished criminality of men over fifty-five years old was relevant and admissible at the penalty phase of a capital trial. In so holding, the Court recognized that evidence of the inverse correlation between age and criminality can affect the jury's determination of a capital defendant's sentence. In this case, had the jury known that defendant could not be eligible for parole until he was sixty-two, as opposed to believing that defendant would be parole-eligible at age fifty-two, the jury's subtle and sophisticated weighing process could have yielded a different sentence. Thus, I conclude that the trial court's failure to inform the jury that it would likely impose the robbery sentences consecutively on defendant was not harmless. On that basis alone, the Court should vacate defendant's death sentence.

In my opinion, the trial court should have instructed the jury that it could consider defendant's parole ineligibility as mitigating evidence. *See Loftin, supra,* 146 *N.J.* at 428, 680 *A.*2d 677 (Handler, J., dissenting). Moreover, I believe that instructing the jury to disregard defendant's noncapital sentence is irrational and confusing. *See id.* at 427, 680 *A.*2d 677 (Handler, J., dissenting); *see also Nelson, supra,* 155 *N.J.* at 523–26, 715 *A.*2d 281 (Handler, J., concurring) (stating consequences of defendant's other, noncapital sentences should be explained to jury and considered as mitigating evidence). The Court has repeatedly required trial

courts to inform juries of the practical effects of their sentences. *See id.* at 370, 680 *A.*2d 677; *Martini I, supra,* 131 *N.J.* at 311, 619 *A.*2d 1208; *Bey III, supra,* 129 *N.J.* at 601, 610 *A.*2d 814. Yet, requiring juries to disregard defendant's aggregate noncapital sentence "has the effect of ... telling them to be 'blind' to this fact." *Loftin, supra,* 146 *N.J.* at 427, 680 *A.*2d 677. In order to protect defendant's rights to fundamental fairness and to be free from cruel and unusual punishment, the jury should be able to consider defendant's noncapital sentences when determining whether he lives or dies.

Therefore, I conclude that defendant's death sentence should be reversed because the trial court did not inform the jury that the court would likely impose a consecutive sentence on the robbery conviction and because the court instructed the jury to disregard defendant's noncapital sentences.

### III

Defendant's trial was riddled with errors. In addition to the court's guilt-phase charge being internally contradictory and incorrect, pernicious prosecutorial misconduct pervaded the guilt and penalty phases. Moreover, the trial court's ultimate-outcome instruction was erroneous and prejudicial. The Court disregards these defects and affirms defendant's convictions and death sentence. I dissent.

O'HERN, J., dissenting.

In this capital case, the trial court erroneously instructed the jury that its verdict on the murder charge had to be unanimous, whether it found defendant guilty as a principal, accomplice, or co-conspirator. That instruction deprived defendant of the fair-trial right to have some of the jurors convict defendant of murder on non-death-eligible grounds. *See State v. Brown,* 138 *N.J.* 481, 651 *A.*2d 19 (1994). Although I dissented from the Court's holding in *Brown* because I believed that the State was entitled to an "acquittal-first" verdict on the charge of capital murder, I believe

with equal conviction that the Court should adhere to its precedent.

In this case, the Court finds the error to be harmless. It is true that other parts of the instruction, and the verdict sheet itself, suggested to the jury that it was not required to be unanimous on the own-conduct triggering element of capital murder. However, we have held that contradictory instructions are inherently inadequate. *State v. Moore*, 122 *N.J.* 420, 433, 585 *A.*2d 864 (1991).

## I

We first addressed, in *State v. Coyle*, 119 *N.J.* 194, 574 *A.*2d 951 (1990), the issue of sequential charges that preclude the simultaneous consideration of non-death-eligible forms of murder with death-eligible forms. In *Coyle*, the trial court instructed the jury that it could not consider the offense of passion/provocation manslaughter without first acquitting the defendant of murder. We held that the trial court's instruction had the "potential to foreclose jury consideration of whether passion/provocation should reduce an otherwise purposeful killing from murder to manslaughter." *Id.* at 222, 574 *A.*2d 951.

The Court, thereafter, has consistently held that trial courts should instruct juries to consider non-capital forms of murder simultaneously with capital murder. *See State v. Mejia*, 141 *N.J.* 475, 483–85, 662 *A.*2d 308 (1995) (requiring simultaneous consideration of intent-to-kill murder and SBI murder); *Brown, supra,* 138 *N.J.* at 519, 651 *A.*2d 19 (requiring simultaneous consideration of murder as principal or accomplice). *Coyle, Brown,* and *Mejia* together stand for the proposition that when a rational basis exists for a jury to convict a capital defendant of a non-death-eligible alternative form of homicide,[1] not only must a trial court charge

---

[1] Non-death-eligible forms of murder include murder as an accomplice or conspirator and murder in the heat of passion or provocation. Formerly, serious-bodily-injury murder (SBI murder) was an alternative form of homicide, not a lesser-included offense of intent-to-kill murder, that also had to be charged

that offense, but it must charge it in such a way that the jury will consider it simultaneously with the consideration of death-eligible murder. The Court agrees with that proposition of law. *Ante* at 39, 716 *A*.2d at 413.

In this case, however, the impermissible sequencing of an alternative, but not lesser-included, theory of non-capital murder removed a legitimate verdict from this jury by requiring unanimity when a non-unanimity charge was required. This error deprived defendant of a fair trial and requires that we now reverse the capital-murder conviction.

## II

The trial court incorrectly instructed the jury that it could not consider accomplice liability unless and until it had acquitted Feaster of murder by his own conduct. Then, and only then, was the jury free to consider accomplice liability:

> In this case the State contends that the defendant Richard Feaster, committed the offenses for which he is charged, the murder, the felony murder, the robbery, I'm talking about those in particular right now, against Keith Donaghy by his own conduct.
>
> If you are convinced of that beyond a reasonable doubt, then you need not consider the alternative type of culpability or responsibility, that is, where a defendant may be found guilty of an offense because of the conduct of another person for whom he is legally accountable.
>
> . . . .
>
> If you are not convinced beyond a reasonable doubt that the defendant acted by his own conduct in committing these crimes, then you may consider and should consider whether he should be found guilty of them because of being legally accountable as an accomplice of such other person, and *you'll only consider these instructions on accomplice liability if you first determine that he is not directly responsible by his own conduct.*
>
> [Emphasis added.]

---

simultaneously. By virtue of constitutional amendment and statutory change, SBI murder is now death-eligible. *N.J. Const.* art. I, para. 12; *L.* 1993, *c.* 111 (signed May 5, 1993); *State v. Mejia, supra,* 141 *N.J.* at 486, 662 *A*.2d at 311.

To compound the error, the court added an incorrect unanimity requirement:

> As I previously instructed, any verdicts rendered *must be unanimous* on any of these charges, whether it be murder, aggravated manslaughter, reckless manslaughter, *accomplice liability.* Your verdicts must be 12 to 0 to be a verdict. I'm going to give you further instructions on that as we go along. All 12 jurors must agree that he's either guilty or not guilty of any of the charges that you are considering.

> [Emphasis added.]

Pursuant to *Brown,* no verdict on a theory of liability (accomplice, principal, or conspirator) need be unanimous. *Brown, supra,* 138 *N.J.* at 519–20, 651 *A.*2d 19.

The court repeated the error, mandating incorrect sequencing that required unanimity:

> I then explained to you the concept of accomplice liability and I told you if you find that the defendant did not commit the crimes by his own conduct, that you should consider whether he should be found guilty because of being legally responsible as an accomplice for the conduct of another under all those principles that I explained.

Finally, the court repeated the incorrect sequencing in connection with the own-conduct charge:

> A defendant may be found guilty of murder either because he committed the murder by his own conduct or [as] an accomplice in the murder. I've just given you a detailed description, an explanation of the principles of accomplice liability, and I *told you that you would consider that only if you first determined that the defendant did not commit the murder by his own conduct.*

> [Emphasis added.]

As the majority observes, there are portions of the charge that correctly instruct the jury on the non-unanimity option. For example, in describing the meaning of the own-conduct requirement, the court stated:

> If you have a reasonable doubt as to whether the killing was by his own conduct or if you are unable to reach a unanimous decision beyond a reasonable doubt as to whether the defendant committed the murder by his own conduct, as distinguished from being responsible for it as an accomplice, that is a permissible final verdict on this issue and that, again, would result in the imposition of a mandatory sentence for murder of at least [thirty] years in prison, up to life, but at least [thirty] without parole.

However, at the conclusion of that portion of the charge, the court again told the jury that accomplice liability need not be considered

unless and until the jury rejected the theory that defendant committed the homicide by his own conduct:

> [I]f you find the defendant guilty of murder, and regarding the by-his-own-conduct question, if you have found him guilty of murder and if it becomes appropriate for you to reach that question, those do not have to be unanimous, as I already explained to you.

It is impossible to reconcile mandated requirements of sequential and unanimous deliberation with the later instruction on non-unanimity. The instructions were internally contradictory. The sequential instructions were incorrect and prevented the jury from simultaneously considering the alternate theories of guilt of non-capital murder. The verdict sheet given to the jury neither directed the jury to deliberate on the questions simultaneously, nor did it propose by-his-own-conduct and accomplice liability as equal alternatives.

As noted, *Brown* held that in order to return a conviction of murder a jury need not be unanimous on the theories of responsibility if the alternate theories apply to commission of the same act and each of them supports the conviction. *Id.* at 511, 651 *A.*2d 19. In *Brown,* the issue, as here, was one of accomplice liability. Brown and his girlfriend were both potentially guilty of having committed the murder, either as principal or as an accomplice of the other. The *Brown* Court held that a non-unanimous verdict on the theory of the homicide was acceptable and, indeed, required. *Id.* at 511–12, 651 *A.*2d 19. Acquittal-first charging is simply incorrect.

The error in this case, as it was in *Brown,* is that a jury cannot be told it must acquit as a principal before it can consider culpability as an accomplice. A murder conviction will surely stand if the jury is split between the two theories of liability. *Id.* at 508, 651 *A.*2d 19. In addition, the instruction to the jury that any verdicts rendered must be unanimous on any of the charges— "whether it be murder, aggravated murder, reckless manslaughter, accomplice liability ... [y]our verdicts must be 12 to 0 to be a verdict"—flatly contradicts the holding in *Brown* by requiring a unanimous verdict on the accomplice-liability question. When two

instructions are given, one right and the other wrong, a reviewing court cannot determine which charge the jury followed. In *Moore, supra,* 122 *N.J.* at 432, 585 *A.*2d 864, contradictory instructions concerning diminished capacity "placed the burden on the defendant to disprove an essential element of the crime" in one section of the charge while maintaining that the burden of proof on the elements "remains on the State throughout the whole trial of the case." The Court stated that such "[c]ontradictory and inconsistent charges are inherently inadequate as they 'create a reasonable likelihood that a juror·understood the instructions in an unconstitutional manner.'" *Id.* at 433, 585 *A.*2d 864 (quoting *Humanik v. Beyer,* 871 *F.*2d 432, 442 (3d Cir.), *cert. denied,* 493 *U.S.* 812, 110 *S.Ct.* 57, 107 *L. Ed.*2d 25 (1989)). "Although the court [in *Moore* ] reinstructed the jury as well that the defendant's failure to disprove the requisite mental state did not relieve the State of its burden, we 'cannot say with any degree of confidence which interpretation [the] jury adopted.'" *Id.* at 434 (quoting *Mills v. Maryland,* 486 *U.S.* 367, 383, 108 *S.Ct.* 1860, 1870, 100 *L. Ed.*2d 384, 399 (1988)). So too in this case we cannot say with any degree of confidence that the jurors understood the instructions in a constitutional manner. At best, the jury had to have been hopelessly confused regarding this most crucial part of the case.

## III

The majority acknowledges that there was error but concludes that the error was harmless. The Court states that "the alternatives of own-conduct murder and accomplice-liability murder presented the jury with one indivisible issue to resolve." *Ante* at 40, 716 *A.*2d at 414. That statement is incorrect. Although largely mirroring the common-law distinction between principal and accomplice liability, the own-conduct concept is "simply irrelevant to the question of whether defendant is guilty of purposeful or knowing murder." *State v. Gerald,* 113 *N.J.* 40, 100, 549 *A.*2d 792 (1988).

During guilt-phase proceedings, the jury first must determine whether defendant should be convicted of murder, considering, where appropriate, principles of

vicarious liability under *N.J.S.A.* 2C:2–6 [such as accomplice or conspiratorial liability]. Only after it has unanimously found defendant guilty of purposeful and knowing murder should the jury turn to the question of whether defendant committed the homicidal act by his or her own conduct.

[*Ibid.*]

The own-conduct analysis requires a slightly different factual inquiry by a jury than the analysis of principal and accomplice liability. This is because a judgment must be made as to whether a defendant's participation in the homicidal act was qualitatively sufficient to make the defendant death eligible. For example, in *Gerald,* the defendant was one of several involved in the beating of an elderly person. We there held that

the "own-conduct" language[ ] does not necessitate a specific finding that the defendant's actions standing alone caused the victim's death. The relevant inquiry is whether or not the defendant *actively and directly participated* in the homicidal act, *i.e.,* in the infliction of the injuries from which the victim died. The critical elements are that [the] defendant in fact acted, and the immediacy of his conduct to the victim's demise.

[*Id.* at 97, 549 A.2d 792.]

It is thus incorrect to state that the two concepts "presented the jury with one indivisible issue to resolve." *Ante* at 40, 716 A.2d at 414; *see State v. Chew,* 150 *N.J.* 30, 74, 695 A.2d 1301 (1997) (explaining why it was correct not to charge on accomplice liability in the own-conduct part of that case). The error was particularly harmful in this case in which the State offered several inculpatory statements attributed to defendant through witnesses whose testimony was sharply contested. Defendant attacked the credibility of the State's witnesses, pointing out that a cellmate who heard defendant say he shot a man "point blank" had difficulty identifying defendant, that another witness desired an award upon defendant's conviction, and, finally, that there were inconsistencies between many witnesses' in-court and out-of-court statements.

The proper disposition is for the jury to decide during the guilt phase, as *Gerald* requires, whether the defendant should be convicted of murder considering, where appropriate, principles of vicarious liability. Once the jury finds defendant guilty, it must then determine whether it was defendant's own conduct that

caused the death. If the two issues subsumed each other, there would be no necessity for an own-conduct charge when a murderer acts alone. For example, in *State v. Biegenwald,* we held that the failure to instruct the jury on accomplice liability, when neither that theory nor facts supporting such a charge was ever put before the jury, was not error. 126 *N.J.* 1, 19, 594 *A.*2d 172 (1991). The *Biegenwald* holding does not affect a jury's obligation to make a finding on the own-conduct issue. A jury must unanimously conclude that a defendant committed the charged murder by his or her own conduct to make that defendant death eligible. Simply stated, the two principles, although similar, are not identical. *Chew, supra,* 150 *N.J.* at 74, 695 *A.*2d 1301. Hence, in a capital case, there should first be a finding of guilt of murder in which the jury should simultaneously consider whether it was as principal, accomplice, or co-conspirator. Only then should the jury consider whether defendant caused that murder by his own conduct.

I would suggest the verdict sheet currently in use be revised as follows:

**NOTE:** THIS FORM ONLY DIFFERS FROM G (1), **SUPRA** BY THE ADDITION OF ACCOMPLICE LIABILITY WITHOUT PAYMENT OR PROMISE OF PAYMENT.

## Jury Verdict

1. ON THE CHARGE OF MURDER [CONSIDERING GUILT AS A PRINCIPAL ACCOMPLICE OR CO-CONSPIRATOR], OUR VERDICT IS:

 A. <u>NOT</u> GUILTY OF MURDER----------------------/____/

 B. <u>GUILTY</u> OF MURDER ------------------------/____/

 C. <u>NOT</u> GUILTY BECAUSE OF INSANITY-----------/____/

 (IF YOU FOUND DEFENDANT GUILTY OF MURDER, DID HE (CHECK "i," "ii," OR "iii").)

 i. PURPOSELY OR KNOWINGLY CAUSE DEATH [OR PURPOSELY OR KNOWINGLY CAUSE SERIOUS BODILY INJURY RESULTING IN DEATH WHILE DEMONSTRATING RECKLESS INDIFFERENCE AS TO WHETHER HIS CONDUCT WOULD CAUSE DEATH][2]-------------------/____/

 ii. PURPOSELY OR KNOWINGLY CAUSE SERIOUS BODILY INJURY RESULTING IN DEATH-----------------------------/____/
 Case will not proceed to a penalty phase.

 iii. UNABLE TO AGREE UNANIMOUSLY AS BETWEEN "i" AND "ii"-----------------/____/
 Case will not proceed to a penalty phase.

 IF YOU HAVE FOUND DEFENDANT GUILTY OF MURDER AND CHECKED "i" ABOVE THEN CHECK "a," OR "b," BELOW.

 a. BY HIS/HER OWN CONDUCT--------------/____/
 Case will proceed to penalty phase.

 b. BECAUSE OF THE CONDUCT OF ANOTHER UNDER PRINCIPLES OF VICARIOUS LIABILITY-----------------/____/

 c. UNABLE TO AGREE UNANIMOUSLY AS BETWEEN "a" and "b"----------------------/____/
 Case will not proceed to a penalty phase.

2. ON THE CHARGE OF AGGRAVATED MANSLAUGHTER, OUR VERDICT IS:

---

[2] Bracketed language to be used without brackets for murders occurring after December 3, 1992. *State v. Cooper,* 151 *N.J.* 326, 376–77, 700 *A.*2d 306 (1997); *see State v. Harris,* 141 *N.J.* 525, 548, 662 *A.*2d 333 (1995).

(DO NOT ANSWER NUMBER 2 UNLESS YOUR VERDICT IS NOT GUILTY OF MURDER "1A.")

A. NOT GUILTY OF AGGRAVATED MANSLAUGHTER----/____/

B. GUILTY OF AGGRAVATED MANSLAUGHTER--------/____/

3. ON THE CHARGE OF RECKLESS MANSLAUGHTER, OUR VERDICT IS:

(DO NOT ANSWER NUMBER 3 UNLESS YOUR VERDICTS ARE NOT GUILTY OF MURDER "1A" AND NOT GUILTY OF AGGRAVATED MANSLAUGHTER "2A.")

A. NOT GUILTY OF RECKLESS MANSLAUGHTER------/____/

B. GUILTY OF RECKLESS MANSLAUGHTER----------/____/

4. ON THE CHARGE OF FELONY MURDER, OUR VERDICT IS:

(DO NOT ANSWER NUMBER 4 IF YOU CHECKED "1C" INSANITY.)

A. NOT GUILTY OF FELONY MURDER--------------/____/

B. GUILTY OF FELONY MURDER------------------/____/

*For affirmance*—Chief Justice PORITZ and Justices POLLOCK, GARIBALDI, STEIN and COLEMAN—5.

*For reversal*—Justices HANDLER and O'HERN—2.